**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 25, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

KENNETH E. FROST,

      Petitioner - Appellant,

v.

REX PRYOR, Warden, Lansing
Correctional Facility; DEREK
SCHMIDT, Kansas Attorney General,[*]

      Respondents - Appellees.

No. 13-3086

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 5:11-CV-03170-SAC)**

---

Jean K. Gilles Phillips, The Paul E. Wilson Project for Innocence and Post Conviction
Remedies, University of Kansas School of Law, Lawrence, Kansas, appearing for
Appellant.

Natalie Chalmers, Assistant Solicitor General, Office of the Kansas Attorney General,
Topeka, Kansas, appearing for Appellees.

---

Before **LUCERO, McKAY,** and **MATHESON,** Circuit Judges.

---

    [*] Rex Pryor, Warden of the Lansing Correctional Facility, is substituted for his
predecessor David McKune, and Derek Schmidt, Kansas Attorney General, is substituted
for his predecessor, Steve Six, pursuant to Fed. R. App. P. 43(c)(2).

**MATHESON**, Circuit Judge.

In 2005, a Kansas state court jury convicted Kenneth Frost of aggravated indecent liberties with a child in violation of Kan. Stat. Ann. § 21-3504 (2004). His attorney failed to obtain the child's medical records, which could have been used to impeach the child's mother and challenge the prosecution's corroborative evidence. Mr. Frost moved for a new trial based on ineffective assistance of counsel. After conducting hearings, the state trial court denied the motion and sentenced Mr. Frost to 204 months in prison. The Kansas Court of Appeals ("KCOA") affirmed. Although it determined that Mr. Frost's trial counsel provided deficient performance by failing to request the child's medical records, the KCOA concluded counsel's performance did not prejudice Mr. Frost. The Kansas Supreme Court denied discretionary review.

Mr. Frost then sought a writ of habeas corpus in federal court under 28 U.S.C. § 2254, arguing (1) his attorney's failure to investigate the child's medical records violated his Sixth Amendment right to effective assistance of counsel and (2) several other claims involving ineffective assistance and prosecutorial misconduct. The federal district court denied relief on the first ineffective assistance claim relating to the child's medical records because of the deference owed to state court decisions on the merits under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The court dismissed Mr. Frost's remaining claims as procedurally barred. It nonetheless issued Mr. Frost a Certificate of Appealability ("COA") on "the [sole] issue [of] whether [Mr.

Frost's] trial counsel was unconstitutionally ineffective in failing to investigate the child's medical records." *Frost v. McKune*, No. 11-3170-SAC, 2013 WL 812153, at *11 (D. Kan. Mar. 5, 2013).

Mr. Frost now appeals, arguing (1) the district court incorrectly denied relief on the merits of his ineffective assistance claim and (2) we should also grant relief on his procedurally barred claims. As to his first issue, we are statutorily bound by AEDPA to ask only if the state court's decision was contrary to, or an unreasonable application of, clearly established Supreme Court law. And the Supreme Court has instructed that unreasonable application occurs only when fairminded jurists could not possibly disagree over the correctness of the state court's decision. Because this standard so severely constrains our review, we affirm the district court's denial of habeas relief on the first issue. As to his second issue, we deny a COA on all remaining claims.

## I. **BACKGROUND**

### A. *Factual History*

In reviewing a § 2254 petition, "[w]e presume that the factual findings of the state court are correct" unless the petitioner presents clear and convincing evidence to the contrary. *Fairchild v. Workman*, 579 F.3d 1134, 1139 (10th Cir. 2009); *see also* 28 U.S.C. § 2254(e)(1). Aside from certain facts that Mr. Frost asserts he was unable to develop due to the ineffective assistance provided by his trial counsel, Mr. Frost does not challenge the state court's determination of the facts in this case. The KCOA described the factual history as follows:

Near the end of 2000 or the beginning of 2001, A.G. (Mother) started dating Frost. Several months later, Mother, her 8-year-old son [] (the child), and the child's twin sibling moved into Frost's home.

After moving into the home, the child began soiling himself in his underwear. According to the child, Frost was sexually abusing him and he was "okay" with soiling himself because he wanted Frost to think he was "kind of gross" and to "stay away." Unaware of the alleged sexual abuse, Mother took the child to several doctors in an attempt to uncover the reason the child was defecating in his clothing.

For reasons unrelated to the issues presented in this case, Mother and the children stopped living with Frost in March or April of 2002. Frost, however, continued to speak with the child and his sibling over the telephone for another 5 or 6 months. According to Mother, Frost's absence coincided with the gradual decrease and eventual cessation of the child's soiling behavior. The child's condition also improved after Dr. David Nichols, the child's primary care physician, prescribed the child medication in December 2002.

On May 7, 2004, Mother took the child to Cindy Coggins, a licensed professional counselor, in order to have him evaluated for possible Attention Deficit Hyperactivity Disorder (ADHD). During this visit, Mother relayed to Coggins her suspicion that the child had been sexually abused. Mother stated the child was withdrawn and had experienced daily bowel problems on and off for the last 3 years, although they had stopped in the 3 weeks prior to the visit. Coggins asked the child during this visit if anyone had hurt him; the child turned to look at his mother but said nothing. Coggins ended the session, advising Mother that if anything had happened to the child, he would disclose it when he was ready.

In the fall of 2004, Frost reportedly attempted to telephone Mother and reinitiate contact with her. When Mother discussed Frost's alleged phone call with her then fiance, the child reportedly overheard the conversation and his soiling behavior resumed. Around that time, the child wrote Mother a letter stating that someone had touched him, specifically mentioning Frost's name.

Mother called Coggins to tell her about the letter and the reoccurrence of the bowel condition. On November 30, 2004, Coggins met with Mother and the child. Mother gave Coggins the letter and, after recording notes

about it, Coggins discarded the letter and conducted her second counseling session with the child. During this session, the child reported that Frost had sexually abused him on two separate occasions in two different rooms, describing each incident in detail. As a mandatory reporter, Coggins reported the suspected abuse to authorities.

The State's investigation resulted in a referral to Sunflower House, a child advocacy center. Sarah Byall, a social worker at Sunflower House, conducted a videotaped interview of the child. During the interview, the child made disclosures consistent with his statements to Coggins.

*State v. Frost*, No. 98,433, 212 P.3d 263, 2009 WL 2371007, at *1 (Kan. Ct. App. July 31, 2009) (unpublished table decision).

## B. *Procedural History*

### 1. **State Proceedings**

#### a. *Charging, preliminary hearing, and first trial*

On February 23, 2005, Mr. Frost was charged with one count of aggravated indecent liberties with a child in violation of Kan. Stat. Ann. § 21-3504 (2001).[1] The court appointed the public defender's office to provide Mr. Frost with representation. It assigned Philip Crawford to Mr. Frost's case. The Kansas Court of Appeals described the preliminary hearing as follows:

At the preliminary hearing, the child testified about two separate instances of abuse occurring in two separate rooms within the house. Slightly different from his prior statement to Coggins, however, the child further

---

[1] The version of the statute in effect at the time of Mr. Frost's alleged abuse proscribed "[a]ny lewd fondling or touching of the person of either the child or the offender, done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child or the offender, or other." Kan. Stat. Ann. § 21-3504(a)(3)(A) (2001).

testified that Frost forced him to take off his and Frost's clothing (not that Frost did it himself) and that no abuse occurred in the bathroom.

Mother also testified at the preliminary hearing, stating that during the relevant time period, she sought medical treatment from Dr. Nichols for the child's bowel condition. After hearing Mother testify that the child never had experienced bowel problems before, Frost advised his attorney that Mother told him the child *did* have soiling issues prior to moving in with Frost in 2001. Frost directed his counsel, Phillip Crawford, to obtain the child's medical records.

*State v. Frost*, 2009 WL 2371007, at *2.

Contrary to Mr. Frost's wishes, Mr. Crawford did not request the child's medical records. According to Mr. Frost, he also "told [Mr.] Crawford on several occasions that [A.G., the child's mother,] threatened to send him back to prison." Aplt. Br. at 8. Mr. Frost further asserts that Mr. Crawford's co-counsel, Michelle Durrett, was present during one of these occasions. *Id.* at 8-9. In addition, Mr. Frost contends that he told Kenneth Lindquist, Mr. Crawford's investigator, about A.G.'s threat. *Id.* In preparation for Mr. Frost's first trial, Mr. Lindquist prepared subpoenas for several witnesses who could testify about A.G.'s threat to send Mr. Frost "back to prison one way or another." *State v. Frost*, 2009 WL 2371007, at *9. The first trial began on September 19, 2005, but the judge declared a mistrial after the state's witness violated a motion in limine prohibiting the introduction of evidence about Mr. Frost's criminal history.

b. *Second trial, conviction, and motion for new trial*

The second trial began on November 28, 2005. Mr. Crawford did not subpoena any of the witnesses who indicated their willingness to testify about A.G.'s threats. Nor

- 6 -

did Mr. Crawford investigate the child's medical records as directed by Mr. Frost. At trial, the child testified that Mr. Frost had sexually abused him on two occasions. When asked about the first instance, the child told the prosecutor that he was playing with his toy cars in his bedroom when Mr. Frost entered the room and

> told me to stand up and touched me, my front private part. And then he made me touch him in the same place. Then he made me pull down my pants and he touched me. And then he made me—he made me pull down his and he made me touch him. And then that's when he threatened to hurt my mom if I ever told anybody.

*State v. Frost*, 2009 WL 2371007, at *5 (quoting Trial Tr. Vol. II, at 242-43).

When asked about the second incident, the child testified:

> He pushed me in my mom's room and he touched me in the private part. And then he told me to pull down my pants and he touched me in my private part again. And then he—then he made me pull down his pants and touched me in his private part. And then he made me do that a couple times. And then he pulled up his pants and left the room.

*Id.* at *6 (quoting Trial Tr. Vol. I, at 245).

This testimony varied from prior accounts given by the child in several respects: (1) the child told counselor Cindy Coggins that Mr. Frost removed the child's pants but later testified that Mr. Frost made the child remove them himself, *see* Trial Tr. Vol. II, at 196-97, 274; (2) the child told Ms. Coggins and social worker Sarah Byall that Mr. Frost removed his own pants but later testified that Mr. Frost forced the child to do so, *see id.* at 196-97, 242-43, 245, 289-90; (3) the child told Ms. Coggins and Ms. Byall that Mr. Frost pushed him onto the bed during one incident but later testified that Mr. Frost pushed him onto the floor, *see id.* at 197, 276, 287; (4) the child told Ms. Coggins that

- 7 -

some of the abuse during the second incident occurred in the bathroom of the mother's bedroom but denied this allegation at trial, *see id.* at 197, 284, 302-03; and (5) the child told Ms. Byall that Mr. Frost had touched his "back private part" but denied this allegation at trial, *id.* at 293, 323. The child also had trouble recalling the precise date and time of day when one of the incidents occurred. *See id.* at 270, 277, 291, 299-300, 303.

Apart from these details, however, the child's trial testimony was consistent with his testimony at the preliminary hearing and his pretrial interviews with counselor Cindy Coggins and social worker Sarah Byall. Ms. Coggins, for example,

> testified from her clinical notes regarding the child's disclosure. Although there were some discrepancies, Coggins' notations regarding the abuse were consistent with the child's testimony at trial; during the first incident Mother and the child's sibling were at the grocery store, the child was playing in his bedroom when Frost approached him, sexually touched him over and under his clothing, forced the child to touch Frost under Frost's clothing, and threatened the child, warning that if the child told anyone of the abuse Frost would hurt the child's mom. During the second incident, the child was in the living room watching television when Frost pushed the child into the bedroom Frost shared with Mother, sexually touched the child, forced the child to touch him, and threatened the child, saying, "If you tell anybody I'll hurt you." According to Coggins, the child never wavered or hesitated in telling her what had happened. Furthermore, Coggins also stated the child "seemed to be relieved" after disclosing the alleged abuse to her, and that during later counseling sessions the child "seemed more peaceful" and "didn't seem to be as withdrawn."

*State v. Frost*, 2009 WL 2371007, at *6 (quotations omitted); *see also* Trial Tr. Vol. II, at 196-97.

A significant portion of the trial testimony concerned the child's bowel control problems. The child's mother testified that her son had "never" experienced these problems before meeting Mr. Frost in 2001. Trial Tr. Vol. I, at 124. When asked by the prosecution on three additional occasions whether she could recall her son having soiling problems before 2001, she replied "no" each time. *Id.* at 123. Although the child maintained that he intentionally soiled his pants to ward off Mr. Frost's advances, *see id.* Vol. II, at 246, 310, expert testimony suggested that the condition was beyond the child's control:

> [Ms.] Coggins testified Mother identified the child's bowel condition as encopresis, which Coggins described as a condition characterized by accidental, involuntary bowel movements. Coggins explained to the jury that, although encopresis generally stems from a physical medical condition, it also can be psychological in nature. When specifically asked whether, if psychologically grounded, the condition is consistent with a child that has been sexually abused, Coggins responded that "it can be."

> In response, Frost presented the testimony of Dr. William Logan, a physician specializing in psychiatry. According to Dr. Logan, the accidental soiling which characterizes encopresis could be caused by several things, including food allergies, gastrointestinal problems, or anxiety. From what Dr. Logan could garner from his review of the child's history, there were several potential causes of the child's soiling problem, including developmental delays, relocations, parental relationships, and numerous school changes. Dr. Logan's testimony stressed that encopresis could result from any of these anxiety provoking phenomena, not just sexual abuse.

> When cross-examined by the State at trial, Dr. Logan admitted he was a forensic psychiatrist, which he defined as "one who yields a psychiatric opinion about some issue of legal importance." Furthermore, when the prosecutor suggested that the "meat and bones" of being a forensic psychiatrist involved "presenting your opinions in court to a fact-finder," Dr. Logan disagreed and explained that his primary function was to

undertake a solid clinical evaluation of the individual. Dr. Logan admitted, however, that in this case, he had been unable to conduct a clinical evaluation of the child and that his opinion was based on the limited records that had been made available, including the child's interviews with Coggins and [with social worker Sarah Byall] at Sunflower House, as well as the preliminary hearing transcript.

*State v. Frost*, 2009 WL 2371007, at *2-3.

Mr. Frost also testified at trial. He denied that he had ever seen the child with his pants pulled down or that the child saw him with his pants pulled down, and he further denied that any fondling or other sexual contact had occurred. *Id.* at *3; *see also* Trial Tr. Vol. II, at 380-81.

The jury convicted Mr. Frost as charged. Mr. Frost requested new counsel and filed a motion for a new trial based on ineffective assistance. Specifically, Mr. Frost faulted his counsel's failure to request the child's medical records, which revealed—contrary to the testimony of both A.G. and her son—that he had been treated for bowel problems in September 1996, approximately five years before meeting Mr. Frost. The records also included a note to the child's school from August 2002 suggesting that the child's soiling problems were attributable to physiological, not psychological, causes: "[S]chool needs note to have juice instead of milk. The child has bowel movement accidents if he drinks milk." *State v. Frost*, 2009 WL 2371007, at *3. Finally, Mr. Frost asserted that his counsel failed to present evidence that A.G. told witnesses in October 2004 that she would "send Frost back to prison one way or another." *Id.* at *9.

After an evidentiary hearing at which Mr. Crawford, Mr. Frost, and the child's primary care physician testified, the state trial court concluded Mr. Crawford's performance was not deficient and denied Mr. Frost's motion for a new trial. *See id.* at *3. On March 7, 2007, the court sentenced Mr. Frost to 204 months in prison. *See Frost v. McKune*, 2013 WL 812153, at *1.

c. *Kansas Court of Appeals*

Mr. Frost appealed to the KCOA, raising, among other issues: (i) an ineffective assistance claim based on his counsel's failure to investigate the child's medical records; and (ii) three other claims, including an ineffective assistance claim based on his counsel's failure to seek testimony about A.G.'s threats to send Mr. Frost "back to prison one way or another" and two prosecutorial misconduct claims regarding commentary on witness credibility.

      i.    <u>Ineffective assistance of counsel for failure to investigate medical records</u>

A majority of the KCOA panel affirmed the state trial court's rejection of Mr. Frost's ineffective assistance claim. *State v. Frost*, 2009 WL 2371007, at *8-9. Although the majority determined that trial counsel's failure to investigate the victim's medical history was constitutionally deficient, *see id.* at *5, it nonetheless held that Mr. Frost was not prejudiced because of the "overwhelming amount of evidence" against him, *id.* at *8. The KCOA began its prejudice analysis by articulating the following standard:

- 11 -

To establish prejudice, a defendant must demonstrate a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.

*Id.* at *5. Applying this standard to the facts of Mr. Frost's case, the KCOA determined that:

[Mr.] Frost must demonstrate a reasonable probability that he would have been acquitted by the jury if they had known (1) the child was seen by a doctor with regard to a soiling condition 5 years earlier, when he was 4 years old, and (2) there was a note dated August 19, 2002, in the child's medical records stating "school needs note to have juice instead of milk. The child has bowel movement accidents if he drinks milk." Given the overwhelming evidence of Frost's guilt presented at trial, we are not persuaded that the jury would have reached a different result had it been presented with the information to which Frost refers.

*Id.*

The KCOA observed that with respect to the evidence presented to the jury, "when compared to what was *consistent* with the child's statements, the inconsistencies are nominal." *Id.* at *7. According to the KCOA, the "child's accounts established the elements of the crime for which [Mr.] Frost was convicted, and it was the jury's function to determine his credibility." *Id.* Further, the "jury was made well aware of evidence explaining away the significance of encopresis, yet chose nevertheless to convict [Mr.] Frost." *Id.* Thus, the "medical records argued for by [Mr.] Frost pale[d] in comparison." *Id.*

As for the evidence not presented to the jury, the court determined that the revelation that the child had suffered from soiling issues five years before meeting Mr. Frost would not "have swayed the minds of the jurors." *Id.* at *8. "Even if [Mr.]

- 12 -

Crawford had introduced evidence proving that the child had bowel problems long before meeting [Mr.] Frost, this fact does not contradict the child's direct testimony that [Mr.] Frost sexually abused him and that he was 'okay' with soiling himself because he wanted [Mr.] Frost to think he was 'kind of gross' and to 'stay away.'" *Id.* Indeed, the state court observed, "because the record cites no medical cause for the bowel problems that occurred when the child was 4 years old, the jury would have been free to infer that the child soiled himself in response to anxiety or trauma back then and, because the bowel condition recurred, there must have been some anxiety or trauma occurring around the time the child moved in with [Mr.] Frost." *Id.* Finally, the state court found the "child's young age, 4 years old, at the time of the pre-abuse soiling[,] render[ed] negligible any effect [the] medical records could have had in impeaching the child's testimony, at 13 years old, that no soiling problems existed prior to coming into contact with [Mr.] Frost." *Id.*

Accordingly, the KCOA affirmed the state trial court's conviction because "evidence establishing one solitary incident of pre-abuse soiling" could not "have had any likelihood of changing the result at trial." *Id.*

One judge dissented on the issue of prejudice. According to the dissenting member of the panel, "one objective fact seemed to corroborate both the mother's testimony and that of the child: his problem of soiling his pants began only after he had moved in with [Mr.] Frost and, thus, presumably in response to [Mr.] Frost's abuse." *Id.* at *13 (Leben, J., dissenting). Had Mr. Crawford requested the child's medical history,

- 13 -

"the cross-examination of those witnesses would have been much stronger," and the "jury might well have considered the objective foundation of the State's case sufficiently shaken that reasonable doubt of guilt had been shown." *Id.*

### ii.  Remaining claims

The KCOA also rejected Mr. Frost's claims that (1) his trial counsel was ineffective in failing to subpoena witnesses to provide testimony on A.G.'s threat to send Mr. Frost "back to prison one way or another" and (2) the prosecution improperly attacked the credibility of Mr. Frost's expert. *See id.* at *9-11.[2]

### d.  *Kansas Supreme Court*

Mr. Frost petitioned the Kansas Supreme Court for discretionary review of the ineffective assistance claim based on trial counsel's failure to investigate the child's medical history.  He did not include the other ineffective assistance claim or the prosecutorial misconduct claims in his petition.  *See Frost v. McKune*, 2013 WL 812153, at *2 (citing Aplt. Pet. for Review at 1, 5-11).  The Kansas Supreme Court denied review on September 7, 2010.

### 2.  **Federal Proceedings**

On September 28, 2011, Mr. Frost filed a federal habeas petition under 28 U.S.C. § 2254, alleging four grounds for relief:  (1) ineffective assistance for failure to

---

[2] The KCOA did not address Mr. Frost's second claim of prosecutorial misconduct—that the prosecution improperly bolstered the child's credibility in its closing argument.  Because we determine that all three of these claims are procedurally barred, as explained below, we do not describe the KCOA's analysis in more detail.

investigate the child's medical history; (2) ineffective assistance for failure to elicit testimony on A.G.'s threats to send Mr. Frost "back to prison one way or another"; (3) improper prosecutorial commentary attacking Mr. Frost's expert during closing arguments; and (4) improper prosecutorial commentary bolstering the child's credibility during closing arguments.

     a.  *Ineffective assistance claim based on failure to investigate the child's medical history*

Applying the considerable deference due to state decisions on the merits under AEDPA, the district court considered and rejected Mr. Frost's claim that his trial counsel provided ineffective assistance by failing to investigate the child's medical history. *See Frost v. McKune*, 2013 WL 812153, at *3-10. Although the district court observed that it would be a close call under de novo review, it felt "compelled" by "the narrow scope of review in habeas cases," *id.* at *10, to dismiss Mr. Frost's petition because the KCOA's resolution of the prejudice issue was neither contrary to nor an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984), which enunciated the federal standard for evaluating ineffective assistance claims.[3] The district court nevertheless granted a COA on this claim. *See Frost v. McKune*, 2013 WL 812153, at *11.

---

[3] The district court acknowledged that the KCOA had determined that Mr. Crawford's performance was constitutionally deficient, but declined to address that issue in more detail. *See Frost v. McKune*, 2013 WL 812153, at *10.

b. *Procedurally barred claims*

The federal district court determined that Mr. Frost's remaining claims were procedurally barred because they were not fairly presented to the Kansas Supreme Court and would now be untimely under Kansas's procedural rules. *See Frost v. McKune*, 2013 WL 812153, at *2; *see also* 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 848-49 (1999) (requiring state prisoners to give state courts "one full opportunity" to resolve constitutional issues related to their custody by "invoking one complete round of the State's established appellate review process," including discretionary review).[4] Nor could Mr. Frost satisfy either of the exceptions to this anticipatory procedural bar because he had failed to (1) "demonstrate cause for his failure to present his claims to the state court," *Frost v. McKune*, 2013 WL 812153, at *2, or (2) "supplement his constitutional claim with a 'colorable showing of factual innocence,'" *id.* (quoting *Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986)). Accordingly, the district court

---

[4] In particular, the district court rejected the following claims: (1) Mr. Frost's ineffectiveness claim concerning his counsel's failure to present evidence about A.G.'s threat that she would "send him back to prison one way or another"; (2) his claim regarding improper prosecutorial commentary attacking Mr. Frost's expert during closing arguments; and (3) his claim regarding improper prosecutorial commentary bolstering the child's credibility during closing arguments. *Frost v. McKune*, 2013 WL 812153, at *1-2.

dismissed these claims and declined to grant a COA on any of them. Mr. Frost filed a

timely notice of appeal.[5]

## II. **JURISDICTION AND STANDARD OF REVIEW**

On appeal, Mr. Frost presses all four issues raised in the district court. A COA is a

prerequisite to appellate jurisdiction in a habeas action. *See* 28 U.S.C. § 2253(c)(1)(A);

*Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). As noted above, the district court

granted a COA "on the issue whether [Mr. Frost's] trial counsel was unconstitutionally

ineffective in failing to investigate the child's medical records." *Frost v. McKune*, 2013

WL 812153, at *11. We therefore have jurisdiction to review this claim pursuant to 28

U.S.C. §§ 1291 and 2253.[6]

The KCOA rejected this claim on the merits. Our review is therefore governed by

AEDPA, which "erects a formidable barrier to federal habeas relief," *Burt v. Titlow*, 134

S. Ct. 10, 16 (2013), and "requires federal courts to give significant deference to state

court decisions" on the merits. *Lockett v. Trammel*, 711 F.3d 1218, 1230 (10th Cir.

---

[5] On May 7, 2013, the district court issued an order granting Mr. Frost leave to proceed *in forma pauperis* ("*ifp*") on appeal.

[6] As noted above, the district court did not issue a COA on any of the claims that it dismissed as procedurally barred. Mr. Frost argues the merits of these claims in his opening brief, but he does not expressly seek a COA. *See* Aplt. Br. at 29-38. We may nevertheless construe his notice of appeal as a request for a COA. *See United States v. Gordon*, 172 F.3d 753, 753-54 (10th Cir. 1999) ("Although Defendant did not renew his request for a COA in this court, we construe his notice of appeal as such a request." (citing Fed. R. App. P. 22(b)(2))). We therefore consider whether Mr. Frost is entitled to a COA on these claims later in this opinion.

2013); *see also Hooks v. Workman*, 689 F.3d 1148, 1162-63 (10th Cir. 2012) ("This highly deferential standard for evaluating state-court rulings demands state-court decisions be given the benefit of the doubt." (quotations omitted)).

Under AEDPA, we may not grant a state prisoner's petition under § 2254 with respect to "any claim that was adjudicated on the merits in State court proceedings" unless the prisoner can show that the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see also Harrington v. Richter*, 131 S. Ct. 770, 783-84 (2011).

"Clearly established law is determined by the United States Supreme Court, and refers to the Court's holdings, as opposed to the dicta." *Lockett*, 711 F.3d at 1231 (quotations omitted). A state court decision is "contrary to" the Supreme Court's clearly established precedent "if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002) (quotations omitted).

A state court decision is an "unreasonable application" of Supreme Court precedent if "the state court identifies the correct governing legal rule from [the] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case."

*Williams v. Taylor*, 529 U.S. 362, 407 (2000) (opinion of O'Connor, J.);[7] *accord Wiggins v. Smith*, 539 U.S. 510, 520 (2003). "Evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule"—like the one adopted in *Strickland*—"the more leeway [state] courts have in reaching outcomes in case-by-case determinations." *Richter*, 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). An "*unreasonable* application of federal law" is therefore "different from an *incorrect* application of federal law." *Id.* at 785 (quoting *Williams*, 529 U.S. at 410 (opinion of O'Connor, J.)).

We may "issue the writ" only when the petitioner shows "there is *no possibility* fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Id.* at 786 (emphasis added). "Thus, "even a strong case for relief does not mean that the state court's contrary conclusion was unreasonable." *Id.* "'If this standard is difficult to meet'—and it is—'that is because it was meant to be.'" *Titlow*, 134 S. Ct. at 16 (quoting *Richter*, 131 S. Ct. at 786). Indeed, AEDPA stops just "short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Richter*, 131 S. Ct. at 786. Accordingly, "[w]e will not lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction'

---

[7] The Supreme Court's opinions in *Williams* were fractured. Justice O'Connor authored the opinion for the Court interpreting the meaning of "contrary to" and "unreasonable application" in § 2254(d)(1). Justice Stevens authored the opinion for the Court interpreting the "clearly established" element. We therefore specify the authoring justice when citing to *Williams*.

- 19 -

for which federal habeas relief is the remedy." *Titlow*, 134 S. Ct. at 16 (quoting *Richter*, 131 S. Ct. at 786).

In making this assessment, however, "we review the district court's legal analysis of the state court decision *de novo*" and its factual findings, if any, for clear error. *Byrd v. Workman*, 645 F.3d 1159, 1165 (10th Cir. 2011) (quotations omitted). Finally, our review is "limited to the record that was before" the KCOA. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

## III. DISCUSSION

Mr. Frost raises four grounds for relief: (1) ineffective assistance of counsel in failing to investigate the child's medical records; (2) ineffective assistance of counsel in failing to elicit testimony about A.G.'s threats to send Mr. Frost "back to prison one way or another," *State v. Frost*, 2009 WL 2371007, at *8-9; (3) improper prosecutorial comment assailing the credibility of Mr. Frost's expert; and (4) improper prosecutorial comment vouching for the credibility of the child. For the reasons stated below, we (A) affirm the district court's decision on the first ground and (B) deny COA on the remaining three claims.

A. *Ineffective Assistance of Counsel for Failure to Request Medical Records*

1. **Legal Background**

The Supreme Court has held that the Sixth Amendment right to counsel includes a right to effective representation. Under *Strickland*, a defendant must demonstrate two elements to prove ineffective assistance:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

To establish constitutionally deficient performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688; *see also Williams*, 529 U.S. at 390-91 (opinion of Stevens, J.). A court considering such a claim must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable assistance. *Strickland*, 466 U.S. at 689. Because we agree with the KCOA's conclusion that Mr. Crawford's failure to investigate the child's medical records fell below this standard, *see State v. Frost*, 2009 WL 2371007, at *5, we focus here on *Strickland*'s prejudice inquiry.[8]

To establish prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Richter*, 131

---

[8] Indeed, under *Strickland*, counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Counsel's failure in this case to obtain the child's medical records plainly fell below an objective standard of reasonableness. *See id.* at 687-88.

S. Ct. at 787 (quoting *Strickland*, 466 U.S. at 687).  Rather, the "likelihood of a different result must be *substantial . . . .*"  *Id.* at 792 (emphasis added).

Thus, "[i]n assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently."  *Id.* at 791.  "Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different."  *Id.* at 792 (quoting *Strickland*, 466 U.S. at 696).  "This does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'"  *Id.* (quoting *Strickland*, 466 U.S. at 693, 697).

2.  *Strickland* **Review Under AEDPA**

As noted above, because the KCOA rejected Mr. Frost's ineffective assistance claim on the merits, we must evaluate this claim through AEDPA's deferential lens.  *See* 28 U.S.C. § 2254(d)(1).  We therefore may grant relief only if Mr. Frost demonstrates that the KCOA's decision was "contrary to, or involved an unreasonable application of, clearly established" Supreme Court law.  *Id.*; *see also Richter*, 131 S. Ct. at 783-84.

"It is past question that the rule set forth in *Strickland* qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States."  *Williams*, 529 U.S. at 391 (opinion of Stevens, J.).  Thus, "[i]f a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that [he] had not

- 22 -

established by a *preponderance of the evidence* that the result of his criminal proceeding would have been different" absent counsel's deficient performance, that decision would be contrary to clearly established Supreme Court precedent because the prisoner "need only demonstrate a '*reasonable probability* that . . . the result of the proceeding would have been different.'" *Id.* at 405-06 (opinion of O'Connor, J.) (quoting *Strickland*, 466 U.S. at 694) (emphasis added); *accord Richter*, 131 S. Ct. at 792 (*Strickland* does not "require a showing that counsel's actions 'more likely than not altered the outcome'" (quoting *Strickland*, 466 U.S. at 693)).

Even if a state court applied the proper "reasonable probability" standard from *Strickland*, we may still grant relief if it applied the standard "unreasonabl[y]," 28 U.S.C. § 2254(d)(1). However, an "'*unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Richter*, 131 S. Ct. at 785 (quoting *Williams*, 529 U.S. at 410 (opinion of O'Connor, J.)). Although making out a *Strickland* claim can be an onerous burden, "[e]stablishing that a state court's application of *Strickland* was *unreasonable* under § 2254(d) is all the more difficult." *Id.* at 788 (emphasis added). Indeed, "[t]he *Strickland* standard is a general one, so the range of reasonable applications is substantial." *Id.*

The Supreme Court has articulated a test for reasonableness: a state court decision is reasonable "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 786 (quoting *Alvarado*, 541 U.S. at 664).

- 23 -

The Court's "fairminded jurists" test thus serves as a proxy for "unreasonable application." It is designed to help federal courts reviewing § 2254 habeas motions to determine whether a state court decision that would be incorrect under de novo review is also unreasonable. Under the test, if all fairminded jurists would agree the state court decision was incorrect, then it was unreasonable and the habeas corpus writ should be granted. If, however, some fairminded jurists could possibly agree with the state court decision, then it was not unreasonable and the writ should be denied. *See Lockett*, 711 F.3d at 1231 ("We may reverse only if all 'fairminded jurists' would agree that the state court got it wrong." (quoting *Richter*, 131 S. Ct. at 786)); *Loggins v. Thomas*, 654 F.3d 1204, 1220 (11th Cir. 2011) ("[I]f some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied.").

We must apply the Supreme Court's "fairminded jurists" test to Mr. Frost's case. Thus, to obtain relief under § 2254(d), Mr. Frost must demonstrate "there is no possibility fairminded jurists could disagree" that he met his burden before the KCOA to show a reasonable likelihood of a different result if the medical records had been used at trial. *See Richter*, 131 S. Ct. at 786 ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." (quoting *Alvarado*, 541 U.S. at 664)).

- 24 -

3. **Analysis**

Mr. Frost argues the KCOA (1) relied on a preponderance standard contrary to *Strickland*'s "reasonable probability" prejudice standard; and (2) unreasonably applied the "reasonable probability" standard to the facts of his case. We disagree.

a. *The KCOA did not apply a standard contrary to* Strickland*'s prejudice standard.*

First, the KCOA did not apply a standard that was "contrary to" *Strickland*. The KCOA correctly recognized that "[t]o establish prejudice, a defendant must demonstrate a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different." *State v. Frost*, 2009 WL 2371007, at *5. The Supreme Court has recently reiterated the very same standard: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Pinholster*, 131 S. Ct. at 1403 (quoting *Strickland*, 466 U.S. at 694).

Mr. Frost argues that the KCOA used an "outcome determinative" standard that "is directly contrary to clearly established Supreme Court precedent." Aplt. Br. at 25. As Mr. Frost observes, some language in the KCOA opinion perhaps suggests it held Mr. Frost to a higher standard than that dictated by *Strickland*. At one point, the KCOA states that "[g]iven the overwhelming evidence of [Mr.] Frost's guilt presented at trial, we are not persuaded that the jury *would have reached a different result* had it been presented with the information to which [Mr.] Frost refers." *State v. Frost*, 2009 WL 2371007, at

- 25 -

*5 (emphasis added)).  This phrasing ("would have"), Mr. Frost argues, evokes a "more likely than not" preponderance standard, which conflicts with *Strickland*'s "reasonable probability" standard.  *See Williams*, 529 U.S. at 406 (opinion of O'Connor, J.); *see also* Aplt. Br. at 26.[9]

But the foregoing articulation of the prejudice standard does not render the KCOA's decision "contrary to" clearly established "Federal law, as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1).  The Court has observed that similar use of the words "would not have" does not necessarily "imply any particular standard of probability."  *Holland v. Jackson*, 542 U.S. 649, 654 (2004) (per curiam).  Indeed, when viewed in its entirety, the KCOA's proper articulation of the prejudice standard in other parts of its opinion confirms that it was not relying on an impermissible "more likely than not" preponderance standard.  *See id.* at 654 ("We have held that such use of the unadorned word 'probably' is permissible shorthand when the complete *Strickland* standard is elsewhere recited." (citing *Woodford v. Visciotti*, 537 U.S. 19, 23-24 (2002) (per curiam))).  The KCOA described the evidence against Mr. Frost as "overwhelming"

---

[9] At oral argument, Mr. Frost raised for the first time the argument that the KCOA erred in requiring a reasonable probability of "acquittal," as opposed to a "different result."  Because "issues may not be raised for the first time at oral argument," *United States v. Abdenbi*, 361 F.3d 1282, 1289 (10th Cir. 2004), we decline to address this argument.  Even if we did, we note that this articulation of *Strickland*'s prejudice standard is not "diametrically different" from, or "mutually opposed" to, clearly established Supreme Court law, *Williams*, 529 U.S. at 406 (opinion of O'Connor, J.).  In *Strickland* itself, the Court observed that "the question is whether there is a reasonable probability that, absent the errors, *the fact finder would have had a reasonable doubt respecting guilt*."  *Strickland*, 466 U.S. at 695 (emphasis added).

- 26 -

and concluded that it did "not believe that evidence establishing one solitary incident of pre-abuse soiling could have had *any likelihood of changing the result* at trial." *State v. Frost*, 2009 WL 2371007, at \*8 (emphasis added). Although perhaps based on an exaggerated reading of the record, this articulation of the prejudice standard is within the permissible bounds of *Strickland*'s admonition against requiring a preponderance of evidence. *See Pinholster*, 131 S. Ct. at 1403 ("A reasonable probability . . . requires a 'substantial,' not just 'conceivable,' likelihood of a different result." (quoting *Richter*, 131 S. Ct. at 792)).

Accordingly, we hold that the KCOA's decision was not "contrary to" clearly established law as determined by the Supreme Court, *see* 28 U.S.C. § 2254(d)(1), and Mr. Frost is not entitled to relief on this ground.

   b. *The KCOA did not unreasonably apply* Strickland's *reasonable probability standard*.

Second, although the issue is close, Mr. Frost has not shown the KCOA's ruling on *Strickland*'s prejudice standard was "so lacking in justification that there was an error . . . *beyond any possibility for fairminded disagreement.*" *Titlow*, 134 S. Ct. at 16 (quoting *Richter*, 131 S. Ct. at 786-87) (emphasis added).

At trial, the State presented evidence to link the victim's encopresis problems with the alleged abuse. In its opening statement and closing argument, the State argued there was a causal connection between the encopresis and the abuse. *See* Trial Tr. Vol. I, at 93-95; *id.* Vol. II, at 428-29. It relied primarily on the mother's testimony (1) denying

- 27 -

the victim had any encopresis problems before her relationship with Mr. Frost and (2) saying the problems arose during the time they were living with Mr. Frost and when Mr. Frost attempted to contact her two years later. *See id.* Vol. I, at 93-95, 123-27; *id.* Vol. II, at 428-29. Counselor Cindy Coggins testified the mother told her in May 2004 that the child had experienced encopresis for three years. *See id.* Vol. II, at 192. She also testified encopresis can be related to sexual abuse. *See id.* at 190-91. The defense, having to accept the mother's version of when the encopresis started because it had not obtained the records showing otherwise, attempted to rebut the encopresis connection through expert witness Dr. Logan, who suggested physiological and psychological factors unrelated to sexual abuse. *See id.* Vol. I, at 100-06; *id.* Vol. II, at 338-39, 415-16.

But it turns out the mother's testimony was false as to when the problems began. Mr. Frost's lawyer failed to obtain records showing the child's primary care physician, Dr. Nichols, treated the child for encopresis roughly four years before he and his mother met Mr. Frost. The defense lawyer's failure to obtain these records violated the performance element of *Strickland*. Whether his failure violated *Strickland*'s prejudice element is less clear. The records undermine the mother's credibility and weaken the evidence of correlation between the encopresis and the abuse. On the other hand, they confirm the child had encopresis and do not foreclose that the abuse revived or exacerbated that condition.

The KCOA provided several reasons why it concluded trial counsel's error did not prejudice Mr. Frost. The court specifically relied on the child's mostly consistent

testimony, the limited impeachment value of the medical records as to the child's allegations that he had been abused, the supporting testimony of counselor Coggins and social worker Byall, and the jury's decision not to credit Mr. Frost's expert. *See State v. Frost*, 2009 WL 2371007, at \*6-8. Additionally, the KCOA observed that "one solitary incident of pre-abuse soiling" was not inconsistent with the prosecution's theory that the child's condition became indisputably worse after meeting Mr. Frost. *Id.* at \*8.

Mr. Frost now argues the mother's false denial about previous encopresis problems shows she tried to induce her son to tell a false story to two therapists, the police, the preliminary hearing court, and the trial court jury. But that is only one possible explanation for her testimony. She may have forgotten the earlier doctor visit for encopresis or at least the timing of it. Or she may have thought, mistakenly and wrongly, that admitting to the earlier encopresis would weaken her son's truthful testimony and the State's case.

As the prosecution said in closing argument, the outcome of this case turned on whether the jury believed the child's testimony about the two incidents. *See* Trial Tr. Vol. II, at 404. We have carefully reviewed the entire record. The child's testimony was specific and mostly consistent about the primary location of each incident, Mr. Frost's aggressive behavior, the general sequence of events, and Mr. Frost's threats to harm his mother if he told anyone. The minor inconsistencies with previous tellings were more in keeping with a credible repetition of the events than a story that is identical from one telling to another. The child not only endured the ordeal of talking in court about the

- 29 -

abuse, but also the embarrassment of discussing his encopresis condition and his belief it would ward off Mr. Frost.

The KCOA's decision did not discuss the credibility of A.G.—the child's mother—in its prejudice application. As the dissent observes, the new evidence that the child had suffered from a bowel control problem before meeting Mr. Frost and that this problem was potentially attributable to milk (as opposed to psychological trauma) had impeachment potential given that A.G. repeatedly denied her son had experienced soiling problems before her meeting Mr. Frost. *See* Trial Tr. Vol. I, at 123-24 (responding "no" three times when asked if her son had experienced these problems before and asserting he had "never" had soiling problems during his tumultuous childhood).

Although the medical records may weaken the mother's credibility, they do not materially undermine the child's. It was the child, not his mother, who testified at trial about the two alleged incidents of sexual abuse. His testimony established the elements of the offense, specifically identifying Mr. Frost. The KCOA reasonably concluded that the value of impeaching a thirteen-year-old over whether he remembered soiling himself when he was four years old was limited when compared with the other evidence indicating Mr. Frost's guilt. *See State v. Frost*, 2009 WL 2371007, at *7-8. Indeed, although the child denied having accidents before meeting Mr. Frost, *see* Trial Tr. Vol. II, at 246, he could not even remember precisely how long he had been having the accidents between the ages of nine and twelve. When asked whether he had "been having trouble

- 30 -

with those accidents for about three years" before seeing Ms. Coggins in May 2004, the child responded, "I don't remember." *Id.* at 265.

In light of the foregoing, we cannot say Mr. Frost has shown the KCOA's ruling on his *Strickland* claim "was so lacking in justification that there was an error well understood and comprehended in existing law *beyond any possibility for fairminded disagreement*." *Richter*, 131 S. Ct. at 786-87 (emphasis added). We may be inclined to agree with Mr. Frost and our dissenting colleague if our review were de novo. We also might be more inclined to side with Mr. Frost if the test were whether the KCOA's *analysis* alone was unreasonable. For example, the KCOA's description of the evidence against Mr. Frost as "overwhelming," *State v. Frost*, 2009 WL 2371007, at \*5, and its disbelief that the medical records "could have *any likelihood* of changing the result at trial," *id.* at \*8 (emphasis added), were both overstatements.

But the critical question is whether the KCOA's *conclusion* was itself unreasonable. *See Byrd*, 645 F.3d at 1170-71 (declining to grant relief based on state court's "failure to conduct the specific analysis" requested by the petitioner because we "fail[ed] to see how its *conclusion* . . . could be construed as being in such tension with governing U.S. Supreme Court precedents, or so inadequately supported by the record, or so arbitrary as to be unreasonable" (quotations omitted) (emphasis added)).

Although we may disagree with the state court's conclusion, we cannot say Mr. Frost has shown "there is *no possibility* fairminded jurists could disagree" over the correctness of its decision. *Howell v. Trammell*, 728 F.3d 1202, 1213 (10th Cir. 2013)

(quoting and emphasizing *Richter*, 131 S. Ct. at 786)); *see also Richter*, 131 S. Ct. at 786

("[E]ven a strong case for relief does not mean the state court's contrary conclusion was

unreasonable."). That is the very narrow space that AEDPA and the Supreme Court have

left us.[10] We are therefore constrained to affirm.

Accordingly, because "fairminded jurists could disagree" over the correctness of

the KCOA's conclusion that Mr. Frost failed to establish a reasonable or "substantial"

---

[10] In this regard, we think the dissent's true quarrel is with the Supreme Court's construction of AEDPA review, not the application of the AEDPA standard in this case. Although the dissent correctly observes AEDPA "does not require all reasonable jurists to agree that the state court was unreasonable," *House v. Hatch*, 527 F.3d 1010, 1019 (10th Cir. 2008), the statute "precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 131 S. Ct. at 786 (quoting *Alvarado*, 541 U.S. at 664).

Nor, contrary to the dissent's assertion, does this deference "by definition preclude relief," *Miller-El*, 537 U.S. at 340, on all ineffective assistance claims advanced by federal habeas petitioners. For example, if the new evidence in this case squarely undermined the child's credibility, then a state decision concluding the defendant failed to establish prejudice would be an "error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 787; *see, e.g.*, *Cannedy v. Adams*, 706 F.3d 1148, 1164-65 (9th Cir. 2013) (concluding that the state court unreasonably applied *Strickland*'s prejudice element because new evidence that the alleged sexual abuse victim said she "just made the allegations of abuse up so she could get away from it all" went "to the heart of her credibility" and "would have been the cornerstone of Petitioner's case"), *cert. denied*, 134 S. Ct. 1001 (2014). So, too, if deficient performance prevented a defendant from presenting considerable mitigation evidence in the penalty phase of a capital case sufficient to cause "at least one juror" to "strike a different balance," *Wiggins*, 539 U.S. at 537, or from presenting strong alibi evidence, *see, e.g.*, *Stitts v. Wilson*, 713 F.3d 887, 894 (7th Cir. 2013) (no "fairminded jurist" would agree with state court's finding of no prejudice where the introduction of alibi witnesses would have transformed the trial "from a one-sided presentation of the prosecution's case into a battle between competing eyewitness testimony"), *cert. denied*, 134 S. Ct. 1282 (2014).

likelihood of a different result, *Richter*, 131 S. Ct. at 786, 792, we hold under AEDPA review that the KCOA did not unreasonably apply *Strickland*'s prejudice standard to the facts of this case.[11]  Mr. Frost is therefore not entitled to habeas relief on this ground.

## B. *Expanding the COA on Mr. Frost's Remaining Issues*

In addition to the sole issue on which the federal district court granted a COA, Mr. Frost appeals the district court's dismissal of (1) his claim that trial counsel provided ineffective assistance by failing to present evidence about A.G.'s threat to send him "back to prison one way or another"; (2) his claim that the prosecutor improperly assailed his expert's credibility during closing arguments; and (3) his claim that the prosecutor improperly vouched for the child's credibility during closing arguments.[12]

As previously noted, Mr. Frost may not appeal the federal district court's decision without a COA.  *Miller-El*, 537 U.S. at 335-36; *Lockett*, 711 F.3d at 1249.  The district court dismissed each of these claims on procedural grounds and refused to grant a COA

---

[11] In reaching this conclusion, we do not consider A.G.'s alleged threat to send Mr. Frost "back to prison one way or another," *State v. Frost*, 2009 WL 2371007, at *9.  Mr. Frost advances an ineffective assistance claim based on his trial counsel's failure to elicit testimony on this threat, but, as we explain below, we deny COA on this claim because reasonable jurists would not debate the district court's determination that Mr. Frost is procedurally barred from raising this claim in federal court.  Accordingly, our prejudice inquiry here does not include this evidence.  *See Hooks*, 689 F.3d at 1191-92 (rejecting five of petitioner's six ineffective assistance claims on performance grounds and conducting prejudice inquiry on remaining claim without considering additional evidence related to the other five claims of ineffective assistance).

[12] Mr. Frost also asserts that the cumulative error from these three claims and his other ineffective assistance claim requires reversal.

for any of them.  Although Mr. Frost does not explicitly seek a COA, we construe his filing of a notice of appeal as a request for a COA.  *See* Fed. R. App. P. 22(b)(2) ("If no express request for a certificate is filed, the notice of appeal constitutes a request addressed to the judges of the court of appeals."); *see also United States v. Gordon*, 172 F.3d 753, 753-54 (10th Cir. 1999) (citing Fed. R. App. P. 22(b)(2)).

1.  **Standard for Granting COA**

Under AEDPA, we may not issue a COA unless "the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253; *see also Slack v. McDaniel*, 529 U.S. 473, 483 (2000).  When a district court dismisses a petition on procedural grounds "without reaching the prisoner's underlying constitutional claim," a COA cannot issue unless the petitioner shows both (1) "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right" and (2) "that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Slack*, 529 U.S. at 484; *accord Dulworth v. Jones*, 496 F.3d 1133, 1137 (10th Cir. 2007).  Rather than addressing these two threshold requirements in order, we may "resolve the issue whose answer is more apparent from the record and arguments."  *Slack*, 529 U.S. at 485.

2.  **Legal Background**

a. *Exhaustion and anticipatory procedural bar*

A federal court cannot grant a state prisoner's habeas petition unless the petitioner has exhausted his claims in state court.  *See* 28 U.S.C. § 2254(b)(1).  Relevant here, a

- 34 -

state prisoner must give state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Thus, any claims not included in a petition for discretionary review are unexhausted. *See id.*

Mr. Frost's claims are now and have long been untimely under Kansas state law. *See* Kan. Sup. Ct. R. 8.03(a)(1) ("jurisdictional" 30 day limit for petitioning state supreme court for discretionary review); *id.* 183(c)(3) (allowing collateral post-conviction relief for "trial errors affecting constitutional rights" that "could have been raised on appeal" only when "exceptional circumstances excuse the failure to appeal"); Kan. Stat. Ann. § 60-1507(f) (one year time limitation for bringing action for post-conviction relief can be extended "only to prevent a manifest injustice"). Accordingly, there is "a procedural default for purposes of federal habeas regardless of the decision of the last state court to which the petitioner actually presented his claims." *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991).[13] We have referred to this as an "anticipatory procedural bar." *See Moore v. Schoeman*, 288 F.3d 1231, 1233 n.3 (10th Cir. 2002) ("'Anticipatory procedural bar' occurs when the federal courts apply procedural bar to an unexhausted

---

[13] Mr. Frost does not dispute that Kansas's procedural rules provide independent and adequate state procedural grounds for barring further review in state court of Mr. Frost's unexhausted claims. We therefore do not address that issue. *See Thornburg v. Mullin*, 422 F.3d 1113, 1141 (10th Cir. 2005) (declining to consider whether state procedural bar was "adequate and independent" because habeas petitioner did "not challenge independence and adequacy here").

claim that would be procedurally barred under state law if the petitioner returned to state court to exhaust it."); *see also Cummings v. Sirmons*, 506 F.3d 1211, 1223 (10th Cir. 2007).

b. *Exceptions to the anticipatory procedural bar*

There are two circumstances where a federal court may nevertheless consider claims subject to an anticipatory procedural bar: (1) if the prisoner has alleged sufficient "cause" for failing to raise the claim and resulting "prejudice" or (2) if denying review would result in a fundamental miscarriage of justice because the petitioner has made a "credible" showing of actual innocence. *See Coleman*, 501 U.S. at 750; *House v. Bell*, 547 U.S. 518, 537 (2006); *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931-32 (2013). Because Mr. Frost only asserts his actual innocence and does not contend he has adequate cause for failing to raise these claims in this case, we do not address the first exception.

"[T]he fundamental miscarriage of justice exception seeks to balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). To make a credible showing of actual innocence, a "petitioner must 'support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" *Cummings*, 506 F.3d at 1223 (quoting *Schlup*, 513 U.S. at 324). This new evidence "must be sufficient to 'show that it is more likely than not that no reasonable juror would have convicted the petitioner in the light of

- 36 -

the new evidence.'" *Id.* (quoting *Schlup*, 513 U.S. at 327); *accord House*, 547 U.S. at 539-40 (reaffirming the *Schlup* test after AEDPA). This standard is "demanding and permits review only in the extraordinary case." *House*, 547 U.S. at 538 (quotations omitted).

3. **Analysis**

We deny COA on all three issues because reasonable jurists would not debate the district court's procedural ruling that (1) Mr. Frost failed to exhaust these claims by not including them in his petition for discretionary review by the Kansas Supreme Court; and (2) he has therefore procedurally defaulted these claims for purposes of federal habeas because the time for petitioning the state court has expired. *See O'Sullivan*, 526 U.S. at 845, 848-49.

Mr. Frost argues that the district court nonetheless erred in determining that he had not satisfied the fundamental miscarriage of justice exception to the anticipatory procedural bar. We disagree. Reasonable jurists would not debate the district court's conclusion that Mr. Frost failed to make the "credible showing of actual innocence," *see Perkins*, 133 S. Ct. at 1931, required to circumvent the anticipatory procedural bar. Although Mr. Frost is correct that the Court's decisions do not require a "traverse" to make this showing, they nevertheless require a petitioner to show that "it is more likely than not that *no reasonable juror* would have found [him] guilty beyond a reasonable doubt" in light of the new evidence. *House*, 547 U.S. at 536-37 (quoting *Schlup*, 513 U.S. at 327) (emphasis added).

- 37 -

Mr. Frost's petition falls short of this demanding standard, which is significantly higher than "that needed to establish prejudice" under *Strickland*. *Schlup*, 513 U.S. at 327. Simply maintaining one's innocence, or even casting some doubt on witness credibility, does not necessarily satisfy this standard. *See Stafford v. Saffle*, 34 F.3d 1557, 1562 (10th Cir. 1994) (new evidence was "only impeachment evidence, rather than evidence of actual innocence" supporting a claim under *Herrera v. Collins*, 506 U.S. 390 (1993)); *cf. Bousley v. United States*, 523 U.S. 614, 623 (1998) (claim of actual innocence must be based on new evidence suggesting "factual innocence, not mere legal insufficiency"). Mr. Frost's new evidence regarding the mother's alleged threats to send him back to prison and the victim's past encopresis does not substantially undermine the victim's testimony of the abuse. Accordingly, we cannot agree with Mr. Frost that, in light of this new evidence, it is "more likely than not" that "no reasonable juror" would have found him guilty. *See House*, 547 U.S. at 536-37.

Because reasonable jurists would not debate the district court's procedural rulings on these issues, we deny COA on each of them.[14]

---

[14] Given this conclusion, we decline to address whether reasonable jurists would debate whether Mr. Frost's petition states a "valid claim of the denial of a constitutional right," *Slack*, 529 U.S. at 484, with respect to these claims. Additionally, we need not address Mr. Frost's argument that cumulative error requires reversal because "we undertake a cumulative-error analysis only if there are at least two errors." *Lott v. Trammel*, 705 F.3d 1167, 1223 (10th Cir. 2013) (quotations omitted).

## IV.    CONCLUSION

For the foregoing reasons, we (1) affirm the district court's denial of habeas relief on Mr. Frost's ineffective assistance claim regarding trial counsel's failure to investigate the child's medical records; and (2) deny COA on Mr. Frost's remaining claims.

13-3086, Frost v. Pryor

**LUCERO**, J., dissenting.

Although my colleagues in the majority state they would be inclined to grant habeas relief had this case come to us on de novo review, they hold that they are compelled to affirm under the highly deferential standard of review applicable to 28 U.S.C. § 2254 claims.  (Majority Op. 31-32.)  The majority notes that the question of whether the KCOA reached an objectively unreasonable decision as to prejudice is a close one.  (Id. at 27.)  I agree the question is close, but conclude upon thorough consideration of the record that the KCOA's treatment of the prejudice issue crossed the line from incorrect to unreasonable.  Therefore, I must respectfully dissent.

I agree with my colleagues that the trial attorney's "failure in this case to obtain the child's medical records plainly fell below an objective standard of reasonableness." (Id. at 21 n.8.)  Frost testified that he instructed his attorney to track down records that would contradict important testimony from the victim's mother, and an investigator testified that she was able to obtain those records in about an hour.  As my colleagues note, it has long been clearly established that counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  Strickland v. Washington, 466 U.S. 668, 691 (1984).

To prevail on an ineffective assistance claim, however, Frost must also show that his attorney's deficient performance caused prejudice.  Id.  To do so, he must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. I recognize, of course, the considerable deference due to the decision of the KCOA pursuant to the Antiterrorism and Effective Death Penalty Act of 1996. See, e.g., Howell v. Trammell, 728 F.3d 1202, 1212-13 (10th Cir. 2013). But "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). Given the centrality of the issue addressed by the medical records that counsel failed to obtain and the potentially devastating effect those records would have had on the prosecution's case, I consider the KCOA's conclusion that counsel's failure was non-prejudicial to be unreasonable.

Frost was convicted of aggravated indecent liberties with a child. As the KCOA dissent highlighted, "one objective fact seemed to corroborate both the mother's testimony and that of the child: his problem of soiling his pants began only after he had moved in with Frost and, thus, presumably in response to Frost's criminal abuse." Frost, 2009 WL 2371007, at *13 (emphasis added). It is no stretch to characterize the correlation of the victim's encopresis and his contact with Frost as the central theme of the trial. The issue was discussed by both the prosecutor and the defense attorney in their opening statements. Seven of the nine witnesses who appeared at trial provided testimony on the victim's encopresis, many of them at great length. And both attorneys addressed the issue in their closing arguments. The prosecution told the jury that "[y]ou

- 2 -

should find it very, very interesting that the only time that these accidents started happening, the only time they happened, was when the defendant had direct contact with [the child] and when the defendant reinitiated contact with his mother that [the child] was aware of." As Judge Leben explained in dissent, however, "[t]he medical records would have provided objective evidence that the child had had this same problem before any acquaintance with Frost." Id.

Moreover, the medical records would have provided an extremely valuable avenue of impeachment. As the majority acknowledges, the KCOA's decision completely failed to address the impact of the records on the credibility of the child's mother. (Majority Op. 30.) She testified repeatedly and emphatically that the child had not suffered similar accidents before the events relevant to the trial:

> Q      Okay. Did [the child] ever start having these accidents before you moved in with the defendant?
> A      No.
> Q      Did you – could you recall ever him having any accidents like this? For example, after you told him that his biological father and he are not going to have any contact did he ever –
> A      No.
> Q      Did he ever start having these accidents any of the other times that you have had to uproot your family and move?
> A      No.
> Q      Did he ever have these accidents after your family unit split up from six, two adults with four children, to two separate families of one adult and two children?
> A      No, he never did.

The KCOA unreasonably failed to consider the medical records' effect on the credibility of the mother. Combined with the court's other errors—including those noted

- 3 -

by my colleagues, (id. at 31), the KCOA's unreasonable analysis resulted in an unreasonable conclusion.

I agree with the majority that the records had less potential to impeach the victim. (Id. at 30-31.)  However, Frost elicited significant testimony suggesting that a mother might put "ideas in [the child's] head" and that a child's testimony could be "taint[ed]" by hearing his mother's conversations.  A forensic psychiatrist testified that a child "may want to please the mother.  He may pick up things that the mother is saying and repeat those."  Trial evidence suggested that the child had trouble verbalizing details of the alleged abuse when his mother was not present.  One witness noted that the victim "turned and looked at his mother" when asked about the abuse and a therapist stated in her report that the child "deferred to his mother for answers regarding abuse."  Thus, evidence that the mother had lied on the stand may have reflected on the child's testimony and the prosecution's entire case.

I respect my colleagues' view on this difficult issue; the AEDPA "standard does not require all reasonable jurists to agree that the state court was unreasonable."  House v. Hatch, 527 F.3d 1010, 1019 (10th Cir. 2008).  However, Frost presents more than simply a strong case for retrial with the benefit of the previously undiscovered medical records. He has shown that the majority decision of the KCOA was unreasonable.  Frost was denied protections guaranteed by the Constitution.  I would remand to the district court with directions to grant the writ.