FILED
United States Court of Appeals
Tenth Circuit

July 7, 2015

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

KEYNON MICHAEL OWENS,

Petitioner - Appellant,

v.

ANITA TRAMMELL,[*] Warden,

Respondent - Appellee.

No. 13-5066

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. NO. 4:12-CV-00117-CVE-FHM)**

---

Howard A. Pincus, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with him on the briefs), Office of the Federal Public Defender, Denver, Colorado, for Appellant.

Ashley L. Willis, Assistant Attorney General (E. Scott Pruitt, Attorney General of Oklahoma, with her on the brief), Office of the Oklahoma Attorney General, Oklahoma City, Oklahoma, for Appellee.

---

Before **TYMKOVICH**, **GORSUCH**, and **PHILLIPS**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

---

[*]  Pursuant to Federal Rule of appellate Procedure 43(c)(2), Anita Trammell is substituted for Mike Addison.

Oklahoma has successfully tried Keynon Owens twice for the first degree felony murder of Javier Carranza during a botched robbery of Javier and his cousin, Jesus Carranza. The first trial resulted in a guilty verdict on felony murder, but an acquittal on the predicate charge of the armed robbery of Javier. The Oklahoma Court of Criminal Appeals (OCCA) reversed the murder conviction and remanded for retrial on the ground that error committed by the trial court resulted in a substantial possibility of prejudice—specifically, that Owens may have been convicted based on his involvement in the robbery as a whole rather than the predicate felony charged in the information.

A second trial also resulted in a conviction on felony murder. On his second appeal to the OCCA, Owens unsuccessfully argued that his retrial violated the Double Jeopardy Clause's command that "no person [shall] be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. He contended the jury's acquittal on the predicate robbery felony (of Javier) at his first trial should have barred the State from retrying him for felony murder under constitutional principles of collateral estoppel. To win a felony murder conviction on retrial, the State had to prove that he robbed Javier and that issue, he argued, was already decided in his favor by the first jury's acquittal. Thus, the retrial forced him "to run the gantlet a second time." *Ashe v. Swenson*, 397 U.S. 436, 446 (1970) (internal quotations omitted).

Owens next sought habeas relief under 28 U.S.C. § 2254 in federal district court.  Deferring to the OCCA's interpretation of federal law, the district court held the denial of Owens's collateral estoppel claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  *Owens v. Addison*, No. 12–CV–0117–CVE–FHM, 2013 WL 1828049 (N.D. Okla. Apr. 30, 2013).

We granted a certificate of appealability (COA) to decide whether Owens's retrial for felony murder violated the Double Jeopardy Clause.  Exercising jurisdiction under 28 U.S.C. § 1291, we now reach the same conclusion as the district court in reviewing the denial of Owens's petition for a writ of habeas corpus.  In our view, Owens has not met his burden of "show[ing] that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

We therefore AFFIRM the denial of the petition and dismiss this appeal.

## I.  Background

The factual and procedural backgrounds are especially important in understanding this appeal, so we recite them in some detail before turning to the relevant Supreme Court precedent.

### A. Factual Background

While at a Tulsa strip club, cousins Javier and Jesus Carranza arranged to meet Brandi Lindsey, one of the dancers, after the club closed. Lindsey then called her boyfriend, Joe Sanders, and the two crafted a plan to rob the Carranzas. At 2:00 am, Javier and Jesus followed Lindsey to the apartment complex where she and Sanders lived.[1] Although the accounts of what happened next differed slightly at trial, everyone agrees that when the Carranzas arrived at the apartment complex they were confronted by two men, later identified as Sanders and Keynon Owens. Sanders demanded money. When the Carranzas ran, he shot both men. Owens went to where Jesus lay wounded on the ground and took his wallet and keys. Sanders meanwhile told Javier—"I told you not to run"—shot him two more times at point blank range, and then took his wallet. Javier died at the scene.

The State charged Owens with four counts that are important to keep in mind in understanding the two resulting trials:

Count II – first degree felony murder of Javier with the predicate felony specified as robbery with a dangerous weapon of Javier;

Count III – shooting with intent to kill of Jesus;

Count IV – robbery with a dangerous weapon of Javier; and

Count V – robbery with a dangerous weapon of Jesus.

---

[1] Because Javier and Jesus share a last name, we refer to them by their first names.

Sanders was charged in the same information with the same counts (in addition to first degree murder) and tried jointly with Owens. Lindsey, who was also charged, reached a plea deal and testified against Owens and Sanders at trial.

### B.     Procedural Background

### 1.     The First Trial

In the opening instructions, the trial judge instructed the jury, consistent with the information, that the felony murder charge against Owens was predicated on the armed robbery of Javier. At the close of trial, however, the jury was sent to deliberate with the following felony murder instruction:

> No person may be convicted of felony murder unless the State has proved beyond a reasonable doubt each element of the crime. These elements are:
>
> > First, the death of a human;
> >
> > Second, the death occurred as a result of an act or event which happened in the defendants' commission of robbery with a dangerous weapon;
> >
> > Third, the elements of the robbery with a dangerous weapon the defendants are alleged to have been in the commission of are as follows:
> >
> > > First, wrongfully;
> > >
> > > Second, attempting to take;
> > >
> > > Third, and carry away;
> > >
> > > Fourth, personal property;
> > >
> > > Fifth, of another;

-5-

> Sixth, from the person or the immediate presence
> of another;
>
> Seventh, by force or fear;
>
> Eighth, through use of a loaded firearm.

R., Vol. I at 228 n.13. The instruction did not specify that Owens could be found guilty of felony murder only if, in determining the third element, the jury found the death occurred during the commission of the robbery of *Javier* with a dangerous weapon. Because Owens was charged with both the robbery of Javier and the robbery of Jesus and because the jury was also given an aiding and abetting instruction, the felony murder instruction opened the door to confusion as to which conduct the jury could consider in returning a felony murder conviction.

This confusion played out in a series of notes from the jury to the trial judge. One note asked, "Can we consider Instruction 37[2] second element to be the whole robbery of <u>both</u> Javier and Jesus[?] We are making the Instruction 47[3] robbery of Javier separate from Jesus. Is that correct?" *Id.* at 229. The trial judge responded, "Instruction #47 relates to count 4 robbery of Javier Carranza. I don't understand the question concerning Instruction #37." *Id.* at 230 n.18. Another note asked, "Can we say not guilty for Keynon Owens on Count

---

[2] Instruction 37 provided the instruction for felony murder.

[3] Instruction 47 provided the instruction for robbery with a dangerous weapon.

4—robbery w/ dangerous weapon of Javier while at the same time saying guilty for . . . Owens on Count 2—felony murder? Would that even make sense?" *Id.* at 229. The judge responded, "I cannot advise you how to decide the case." *Id.* at 230 n.18.

The jury returned the following verdict, illustrated in the table below: guilty of felony murder of Javier (Count II), not guilty of shooting Javier with intent to kill (Count III), not guilty of robbery with a dangerous weapon of Javier (Count IV), and guilty of robbery with a dangerous weapon of Jesus (Count V). In other words, the jury found Owens guilty of causing Javier's death while robbing him with a dangerous weapon, but not guilty of robbing him with a dangerous weapon.

| Count | Charge | Jury Verdict in First Trial |
|-------|--------|------------------------------|
| 2 | First degree felony murder of Javier with the predicate felony specified as the robbery of Javier with a dangerous weapon | Guilty |
| 3 | Shooting Javier with intent to kill | Not guilty |
| 4 | Robbery with a dangerous weapon of Javier | Not guilty |
| 5 | Robbery with a dangerous weapon of Jesus | Guilty |

### 2.    *The First Appeal to the OCCA*

On appeal to the OCCA after his first trial, Owens raised what the court interpreted as two distinct sufficiency of the evidence arguments. The first was a traditional sufficiency argument that the evidence presented at trial could not sustain the murder conviction or the Jesus robbery conviction. On this ground, the court "d[id] not hesitate to conclude that the evidence presented . . . was more than sufficient to sustain Owens' convictions." *Id.* at 223. Specifically with regard to the murder conviction, the court found that "despite the jury's decision to acquit Owens of the armed robbery of Javier (Count IV), the evidence presented at trial was also sufficient to convict Owens of this robbery *and* to convict him of the felony murder of Javier, with this robbery as the underlying felony (Count II)." *Id.* at 224.

The second argument before the OCCA was that the evidence must have been insufficient to convict him of felony murder because the jury acquitted on the predicate felony. The OCCA interpreted this as an argument that the verdict was "logically inconsistent and result[ed] in an inconsistent verdict." *Id.* at 225. Citing Supreme Court precedent, the OCCA found that the logical inconsistency in the verdicts did not impugn the validity of the murder conviction. The court did not stop there, however. Relying on the trial court's closing instructions and the jury notes, the court found that "it [was] *far* from clear that the jury who tried Owens was *choosing* to render an inconsistent verdict." *Id.* at 226–27. Rather,

-8-

the court believed "the record strongly suggest[ed] that the jury was struggling to figure out how to interpret the court's felony murder jury instructions and that the jury was, in fact, attempting to render a verdict that was both logical *and* consistent with instructions that the jury found confusing, particularly regarding the felony murder counts and the relationship between Counts II and IV." *Id.* at 227.

The court accordingly reversed and remanded the murder conviction for plain error, finding the cumulative effect of the open-ended jury instruction and the trial judge's failure to adequately respond to jury questions resulted in the substantial possibility that "[t]he jury may well have convicted Owens on Count II, the felony murder of Javier, based upon a crime that was not charged as the underlying felony of this murder (the robbery of 'both' Carranzas), rather than the crime that was actually charged as the underlying felony (the robbery of Javier only)."[4]  *Id.* at 231.

### 3.    *The Second Trial and the Second Appeal to the OCCA*

On remand, Owens moved to dismiss the murder charge on the ground that retrial would violate the Double Jeopardy Clause.  The trial court denied the

---

[4]  Owens's brief on his first appeal is not in the record, but the OCCA dissent criticized the majority for "*sua sponte* creating an issue that was not raised by an appellant" because Owens's brief had "not even address[ed] the jury's notes nor does he argue the jury was in any way confused about what they were to do."  R., Vol. I at 236.

motion, and the State successfully tried Owens for felony murder.[5]  Owens appealed the conviction to the OCCA, again contending that the Double Jeopardy Clause should have been a bar to his retrial.

Owens made two double-jeopardy arguments to the OCCA.  He first argued that because greater and lesser included offenses are the "same offense" for purposes of double jeopardy, the acquittal on the lesser included offense—the robbery of Javier—terminated jeopardy not only as to that charge, but also on the greater included felony murder charge.  Retrial on the felony murder charge therefore violated his right not to be in jeopardy twice for the same offense. Owens also argued the retrial was barred by constitutional principles of collateral estoppel.  He contended that the jury's acquittal on the Javier robbery charge necessarily determined an issue of ultimate fact—that he did not commit the robbery—by a valid and final judgment.  Because the retrial involved the same parties and the robbery of Javier was an element of the felony murder charge, he argued collateral estoppel should apply.

The OCCA rejected both arguments.  The court recognized that the jury's acquittal on the Javier robbery charge terminated jeopardy as to that charge, but the court disagreed that robbery and felony murder were the "same offense" for purposes of double jeopardy.  Because they were not the same offense, Owens

---

[5]  It is undisputed that the State could not have tried Owens again for the robbery of Javier.  The first jury's acquittal terminated jeopardy on that charge. *See Fong Foo v. United States*, 369 U.S. 141, 143 (1962).

-10-

was still subject to continuing jeopardy on the felony murder count. In rejecting the collateral estoppel argument, the court held that the inconsistency between the felony murder conviction and robbery acquittal meant collateral estoppel could not apply because it was impossible to know what the jury decided by its acquittal.

### 4.    *Federal Habeas Proceedings*

Owens reasserted his double jeopardy claims in his federal habeas petition. Although his arguments in his initial petition did not go into any great detail (perhaps due to the inherent limits of the form petition provided to *pro se* prisoners), his reply to the State's opposition brief clearly spelled out his double jeopardy arguments. In fact, Owens recited the arguments made by his counsel to the OCCA on his second appeal nearly word for word.

The district court denied the petition and a COA. *See* 28 U.S.C. § 2254(c)(1)(A) (requiring a COA to appeal to this court). On Owens's application for a COA from this court, we granted a COA, appointed counsel, and ordered supplemental briefing on the following issue: "Did the prosecution of petitioner on felony murder charges in the second trial, following his acquittal of the underlying felony in the first trial, violate any aspect of the Double Jeopardy Clause of the United States (specifically including the Double Jeopardy Clause's collateral estoppel component)." *Owens v. Addison*, No. 13-5066 (10th Cir. Oct. 8, 2013) (order granting COA).

## II. Discussion

In defending the grant of COA, Owens focuses exclusively on the OCCA's rejection of his collateral estoppel argument.[6] He makes three arguments as to why the OCCA's denial of his claim was contrary to, or an unreasonable application of, Supreme Court precedent:

1.      The OCCA failed to undertake the proper analysis in determining whether the verdicts from the first trial were inconsistent and was wrong to treat the verdicts as inconsistent, in violation of *United States v. Powell*, 469 U.S. 57 (1984).

2.      The OCCA unreasonably extended the Supreme Court's collateral estoppel analysis to his case or alternatively unreasonably applied that analysis, in violation of *Ashe v. Swenson*, 397 U.S. 436 (1970).

3.      The OCCA unreasonably relied on the principle of continuing jeopardy and short-circuited the collateral estoppel analysis, in violation of *Yeager v. United States*, 557 U.S. 110 (2009).

---

[6] He does not reassert his argument that the retrial subjected him to successive prosecution for the same offense. Nor does he challenge the OCCA's rejection of his arguments that robbery and felony murder are the "same offense" for purposes of double jeopardy or that the acquittal on the robbery charge was a jeopardy terminating event that superseded the continuing jeopardy on the felony murder charge. We therefore do not decide whether those aspects of the OCCA's decision were contrary to, or an unreasonable application of, clearly established federal law.

After reviewing the standard and scope of review that controls our analysis, we take each of the three arguments in turn, identifying the legal framework relevant to each as we go.

### A.     *Standard and Scope of Review*

Our review of the OCCA's decision is bound by the deferential standards of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  Where a state prisoner raises a claim that has been "adjudicated on the merits in State court proceedings," as is the case here, we may intervene only if "the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)–(2).  Clearly established law refers to "the holdings, as opposed to the dicta of [Supreme] Court[] decisions." *Howes v. Fields*, 132 S. Ct. 1181, 1187 (2012) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

It is the petitioner's burden to make this showing and it is a burden intentionally designed to be "difficult to meet."  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011); *see also Burt v. Titlow*, 134 S. Ct. 10, 16 (2013) ("AEDPA erects a formidable barrier to federal habeas relief . . . ."); *Richter*, 562 U.S. at 102 ("If this standard is difficult to meet, that is because it was meant to be.");

*Frost v. Pryor*, 749 F.3d 1212, 1223 (10th Cir. 2014) ("AEDPA stops just short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." (internal quotation marks omitted)). AEDPA "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Richter*, 562 U.S. at 102–03 (internal quotation marks omitted).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Court has on a set of materially indistinguishable facts." *Dodd v. Trammell*, 753 F.3d 971, 982 (10th Cir. 2013) (alterations omitted) (quoting *Williams*, 529 U.S. at 413). "It is not enough that the state court decided an issue contrary to a lower federal court's conception of how the rule should be applied; the state court decision must be 'diametrically different' and 'mutually opposed' to the Supreme Court decision itself." *Bland v. Sirmons*, 459 F.3d 999, 1009 (10th Cir. 2006) (quoting *Williams*, 529 U.S. at 406).

The "unreasonable application" prong requires that the state court "identifie[d] the correct governing legal principle from [Supreme Court] decisions but unreasonably applie[d] that principle to the facts of the prisoner's case." *Id.* (quoting *Williams*, 529 U.S. at 413). The Supreme Court has "stressed that the relevant inquiry is not whether the state court's application of federal law was

-14-

*incorrect*, but whether it was 'objectively unreasonable.'" *Anderson v. Mullin*, 327 F.3d 1148, 1153 (10th Cir. 2003) (quoting *Williams*, 529 U.S. at 413). A petitioner can satisfy this standard "only by showing that there was no reasonable basis" for the state court's determination. *Cullen*, 131 S. Ct. at 1402 (internal quotation marks omitted). In other words, "so long as fairminded jurists could disagree on the correctness of the state court's decision," habeas relief is unavailable. *Richter*, 562 U.S. at 101 (internal quotation marks omitted).

In undertaking this review, we presume the state court's factual findings are correct and place the burden on the petitioner to rebut that presumption by clear and convincing evidence. *Bland*, 459 F.3d at 1009 (citing 28 U.S.C. § 2254(e)(1)). Our review of the district court's legal analysis of the state court decision is de novo. *Id.*

We now address Owens's three arguments for habeas relief.

### B.     *Inconsistent Verdicts*

Owens's first argument is that the OCCA erred in concluding that the verdicts from the first trial were "truly inconsistent" and thus erred in relying on that inconsistency to reject his collateral estoppel argument.

#### 1. *Supreme Court Framework Applying Collateral Estoppel and Inconsistent Verdicts*

#### a. *Collateral Estoppel*

The Double Jeopardy Clause prevents the government from placing a defendant in jeopardy twice for the same offense. Although most commonly thought of as a bar to successive prosecutions and multiple punishments for the same offense, the Supreme Court has held that the Clause also "incorporates the doctrine of collateral estoppel in criminal proceedings." *Schiro v. Farley*, 510 U.S. 222, 232 (1994) (citing *Ashe v. Swenson*, 397 U.S. 436 (1970)). Just as in the civil context, collateral estoppel means "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe*, 397 U.S. at 443. A jury's acquittal, for example, "unquestionably terminate[s] . . . jeopardy with respect to the issues finally decided in those counts" in a second trial on a separate offense. *Yeager v. United States*, 557 U.S. 110, 118 (2009). It is the defendant's burden to show that the jury's verdict "necessarily decided" the issue he seeks to foreclose from relitigation and that the same issue is essential to the subsequent proceeding. *See id.* at 119; *see also Dowling v. United States*, 493 U.S. 342, 350 (1990).

To determine what a jury decided, *Ashe* held courts are to "examine the record of [the] prior proceeding, taking into account the pleadings, evidence,

-16-

charge, and other relevant matter," and "with an eye to all the circumstances of the proceedings," ask "whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." 397 U.S. at 444 (internal quotation marks omitted). If "there [are] any number of possible explanations for the jury's acquittal verdict, the defendant ha[s] failed to satisfy his burden." *Schiro*, 510 U.S. at 233 (quoting *Dowling*, 493 U.S. at 352) (internal quotation marks omitted).

In *Ashe*, the defendant was charged with being one of several masked men who robbed a group of six individuals playing poker. The State unsuccessfully tried him for the robbery of one of the individual poker players. After he was acquitted, the State proceeded to try him for the robbery of a different player and that time the jury returned a guilty verdict. The Supreme Court held "the subsequent prosecution was constitutionally prohibited," *Yeager*, 557 U.S. at 119, because the "single rationally conceivable issue in dispute before the jury" in the first trial had been Ashe's identity as one of the robbers. *Ashe*, 397 U.S. at 445. Because the first jury by its acquittal must have decided that Ashe was not one of the robbers, the State was estopped from relitigating that issue in a subsequent trial.

### b. Powell*'s Explanation of Inconsistent Verdicts*

What happens when a jury returns inconsistent verdicts? The Supreme Court has long recognized that "[c]onsistency in the verdict is not necessary,"

*Powell*, 469 U.S. at 62 (quoting *Dunn v. United States*, 284 U.S. 390, 394 (1932)), and the presence of "a logical inconsistency between a guilty verdict and a verdict of acquittal does not impugn the validity of either verdict." *Yeager*, 557 U.S. at 112. But the Court has also said that inconsistency in verdicts affects a defendant's ability to establish collateral estoppel because, where the same jury returned a conviction that is logically inconsistent with the acquittal that is purportedly deserving of preclusive effect, it is impossible to know what the jury decided by the acquittal. *Powell*, 469 U.S. at 68; *see also Standefer v. United States*, 447 U.S. 10, 23 n.17 (1980) ("This inconsistency is reason, in itself, for not giving preclusive effect to the acquittals . . . .").

In *Powell*, the Supreme Court reaffirmed its prior holding in *Dunn v. United States*, 284 U.S. 390 (1932), that inconsistent verdicts are not grounds for reversal. A jury convicted Powell of the compound offense of using the telephone while committing and facilitating various substantive drug offenses, but acquitted her of the standalone drug offenses. The Court reasoned that where a jury returns a "truly inconsistent" verdict, "[t]he most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt." *Powell*, 469 U.S. at 63 (quoting *Dunn*, 284 U.S. at 393). Inconsistent verdicts, the Court explained, "even verdicts that acquit on a predicate offense while convicting on the compound offense—should not

-18-

necessarily be interpreted as a windfall to the Government at the defendant's expense. It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense." *Id.* at 65.

Given that, the Court rejected Powell's argument that collateral estoppel should attach to the acquittal and preclude acceptance of the guilty verdict because "the argument necessarily assumes that the acquittal on the predicate offense was proper—the one the jury 'really meant'" and "that, of course is not necessarily correct; all we know is that the verdicts are inconsistent." *Id.* at 68. And once it is established "that the same jury reached inconsistent results . . . principles of collateral estoppel—which are predicated on the assumption that the jury acted rationally and found certain facts in reaching its verdict—are no longer useful." *Id.*

More recently, in *Yeager*, the Supreme Court resolved a lingering circuit split on the issue of "whether an apparent inconsistency between a jury's verdict of acquittal on some counts and its failure to return a verdict on other counts affects the preclusive force of the acquittals under the Double Jeopardy Clause." 557 U.S. at 112. In that case, a jury acquitted Yeager of fraud charges and hung on insider trading charges. When the government reindicted him on insider trading, Yeager moved to dismiss on the ground that the fraud acquittals in the first trial reflected a decision by the jury that he did not possess material,

nonpublic information—an issue that would reappear in a trial on insider trading. The Supreme Court held hung counts are "non-events" that have no place in the collateral estoppel analysis and therefore the acquittal could give rise to collateral estoppel if, under *Ashe*, Yeager could show the jury necessarily determined he did not possess material, nonpublic information.

As relevant here, one of the government's arguments in *Yeager* was that allowing the acquittals to preclude retrial on hung counts would violate *Powell* because it would impute irrationality to the jury. The argument was that if the jury's acquittal on the fraud counts was based on a finding that the government failed to establish Yeager possessed material, nonpublic information, it would have been irrational for the jury to then hang, rather than acquit, on insider trading.

In rejecting the government's argument, the Court distinguished *Powell* on two grounds. First, the Court stated that an inconsistency between a verdict and a hung count is fundamentally different than an inconsistency between verdicts. Because a jury speaks through its verdicts, courts must give "each verdict full effect, however inconsistent." *Id.* at 124. Second, the Court disagreed with the premise that "a mistried count can, in context, be evidence of irrationality." *Id.* at 124–25. Hung counts, unlike verdicts, cannot be evidence of anything because they reflect only a failure to decide. *Id.* at 125.

### 2.    *Application*

Owens contends the OCCA's decision was contrary to, or an unreasonable application of, clearly established law because the court applied the rule in *Powell* to his collateral estoppel argument in a case that did not involve truly inconsistent verdicts.  He argues that the verdicts are inconsistent only in a "formal" sense—that is, only when compared to the crimes as charged in the information.  When viewed in the context of the jury instructions and the jury notes, however, they can be reconciled.  A rational jury following the trial court's instructions could only have acquitted on robbery because they believed Owens was not guilty and convicted on murder because they believed the predicate offense could be either the robbery of Jesus or some combination of the robbery of Javier and Jesus.  If that is true and the verdicts were not "truly inconsistent," Owens says *Powell* did not preclude the application of collateral estoppel to the acquittal.  In support, he points us to the language in the OCCA's first opinion finding the jury was striving to return consistent verdicts.  The State argues in response that this argument is waived because it was never raised below.

This court is aware that Owens received the benefit of new counsel after we granted a COA.  While we appreciate counsel's well-reasoned argument, we must agree with the State that this theory of consistency between the verdicts is raised for the first time in the supplemental briefing.

-21-

In fact, as we recounted above, Owens relied on the inconsistency of the verdicts before the OCCA on his first appeal to make his sufficiency challenge. And on his second appeal to the OCCA, Owens's collateral estoppel argument was not that the verdicts were consistent, but that the "legal principles" of *Yeager* should apply to his case. He explicitly invoked *Yeager*'s discussion of "collateral estoppel, *inconsistent verdicts*, and how an acquittal factors into that equation." R., Vol. 1 at 88 (emphasis added). Specifically, Owens pointed to the Court's discussion of the unassailable finality of acquittals in double jeopardy jurisprudence and the Court's statement that "[a] jury's verdict of acquittal represents the community's collective judgment regarding all the evidence and arguments presented to it." *Id.* (quoting *Yeager*, 557 U.S. at 122). Although he acknowledged that "the facts in *Yeager* are not exactly the same as those in his case because his case involves an acquittal and a conviction while *Yeager* involves an acquittal and a mistrial due to a hung jury," he argued that "the Court's discussion of the legal principles are applicable in both cases." *Id.* His argument was that just as the apparent inconsistency between the acquittal and the hung counts in *Yeager* did not affect the preclusive force of the acquittal, the same should be true in his case. In other words, collateral estoppel should apply in spite of the inconsistency. *See also* Oral Argument at 2:32–2:42 ("He didn't specifically say that those two verdicts were consistent based on how the [OCCA] decided the first trial.").

This is the theory Owens repeated in his federal filings, including his habeas petition and his reply to the State's opposition to his petition.[7]  Nothing in the district court's opinion suggests it confronted the issue of whether the verdicts were "truly inconsistent."

Owens contends the argument is preserved on appeal because his overarching argument has always been that the acquittal was entitled to preclusive effect.  There was a collateral estoppel claim before the OCCA, before the district court, and now before us on appeal, and that, he says, is enough.  We cannot agree.  We have long applied the rule that we do not consider issues not raised in the district court to bar not only "a bald-faced new issue" presented on appeal, but also situations "where a litigant changes to a new theory on appeal that falls under the same general category as an argument presented [below]."  *Lyons v. Jefferson Bank & Trust*, 994 F.2d 716, 722 (10th Cir. 1993).  Because the argument was not raised in his habeas petition, it is waived on appeal.[8]  *See Stouffer v. Trammell*, 738 F.3d 1205, 1222 n.13 (10th Cir. 2013); *Jones v. Gibson*,

---

[7] Owens argues that the form habeas petition provided to *pro se* litigants required him to do no more than identify his double jeopardy claim.  But the district court was not relying solely on Owens's form petition.  He also filed a response to the State's brief in opposition to his habeas petition.  The response copied his counsel's argument from his second appeal to the OCCA nearly word for word.  As already discussed, that brief did not raise the argument now before us.

[8] We do not reach the State's argument that Owens failed to exhaust his state court remedies because we base our decision on Owens's failure to raise the theory in the district court.

206 F.3d 946, 958 (10th Cir. 2000); *Rhine v. Boone*, 182 F.3d 1153, 1154 (10th Cir. 1999).

Even so, if we were to interpret Owens's argument below broadly and find the argument preserved, he would still not be entitled to relief. His argument is that the OCCA did not consider whether the verdicts were truly inconsistent as *Powell* requires and thus applied a legal standard that contradicts governing law. The problem is that *Powell* did not address the precise issue raised by Owens: *how to determine if verdicts are truly inconsistent.* The Court had no reason to discuss whether the verdicts were in fact inconsistent because Powell's argument invoked and relied on the inconsistency and the government did not challenge the inconsistency. *Powell*, 469 U.S. at 61 n.5. Faced with such a consistency argument, should courts review the record, attempt to reconcile the verdicts, and if a possible path to consistency (and therefore jury rationality) exists, find the rule in *Powell* inapplicable and give collateral estoppel effect to the acquittal? Or should courts decline to speculate as to why the jury reached facially inconsistent results?

*Powell* does say "[truly] [i]nconsistent verdicts . . . present a situation where 'error,' in the sense that the jury has not followed the court's instructions, most certainly has occurred, but it is unclear whose ox has been gored." 469 U.S. at 65; *see also* Eric L. Muller, *The Hobgoblin of Little Minds? Our Foolish Law of Inconsistent Verdicts*, 111 Harv. L. Rev. 771, 791 (1998) ("[I]nconsistent

verdicts present a certainty of legal error . . . .").  And it appears from the facts presented by the Court there would have been no path to reconcile the verdicts in *Powell*—a rational jury could not have followed the trial court's instructions and still have returned the verdict that it did.

The instructions in Owens's case were different.  The trial court's instructional error left open a *conceivable* way to reconcile the verdicts and thus it is not the case that "error . . . most certainly occurred."  *Powell*, 469 U.S. at 65. Owens says this is enough to find the verdicts are not "truly inconsistent" and if the verdicts are consistent, *Powell*'s instruction that principles of collateral estoppel cannot apply in the face of inconsistency would have no place in the collateral estoppel analysis.

Owens may be right, but to credit his theory of how the jury reached its inconsistent results runs directly into the *Powell* Court's rejection "as imprudent and unworkable, a rule that would allow criminal defendants to challenge inconsistent verdicts on the ground that in their case the verdict was not the product of lenity, but of some error that worked against them.  Such an individualized assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake."  *Id.* at 66; *see also Dunn*, 284 U.S. at 394 ("That the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible.  But verdicts cannot be upset by speculation or

inquiry into such matters."). This raises the question of whether and to what degree it is possible to undertake a review of the record for a path to consistency without engaging in the speculation and intrusion into the jury's sovereign space that *Powell* instructed lower courts to avoid.

In Owens's case, for example, the ambiguity in the jury instructions opened at least two possibilities: (1) the jury acquitted on the Javier robbery charge on the ground that the government failed to meet its burden and convicted on the murder charge by using the robbery of Jesus or Owens's participation in the robbery as a whole as the predicate; or (2) the jury believed Owens was guilty of robbing Javier and convicted him of felony murder on that basis, but acquitted on the lesser charge out of lenity, mistake, or compromise. As Owens points out, we presume that jurors follow jury instructions and the former reconciles the verdicts.

But the most convincing evidence that this was the path taken by the jurors is the notes sent to the judge during deliberations. In one of the notes, for example, the jury asked whether the predicate felony could "be the whole robbery of <u>both</u> Javier and Jesus." R., Vol. I at 229. In another, the jury asked whether a verdict convicting Owens on felony murder but acquitting him on the robbery of Javier would "even make sense." *Id.* Jury notes, of course, are not solid ground on which to stand. The dissent in the first direct appeal in the OCCA made the argument, and it is hard to deny, that "there were no times noted on the jury's

-26-

notes to the court and we do not know how much time passed between their last note to the court and the return of the verdict." *Id.* at 236; *see also United States v. Espinoza*, 338 F.3d 1140, 1148–49 (10th Cir. 2003) ("Further discussion may have changed minds. And we cannot even be sure that the [jury] note expressed a jury consensus at the time it was written. It may have represented an effort to accommodate a minority, or even a single member, of the jury."). We also cannot know the impact, if any, of the fact that the jury was properly instructed on felony murder in the opening instructions. Ultimately, to reach a conclusion one way or the other, would require "speculation into what transpired in the jury room." *Yeager*, 557 U.S. at 122; *see also id.* ("Courts properly avoid such explorations into the jury's sovereign space . . . .").

We need not decide what approach to take to an argument that facially inconsistent verdicts may be reconciled and the ordinary preclusive force may be applied to an acquittal because our role on AEDPA review ends with a determination that the law is not clearly established. *Fairchild v. Workman*, 579 F.3d 1134, 1139 (10th Cir. 2009) ("[W]hether the law is clearly established is dispositive of the § 2254(d)(1) analysis."). The *Powell* Court "did not . . . address . . . how courts should determine whether verdicts are inconsistent when a defendant seeking to benefit from the collateral estoppel effect of an acquittal denies that the acquittal really is in conflict with a conviction that the jury also rendered. Nor has the Supreme Court had occasion to address that issue in any

-27-

subsequent case." *United States v. Bravo-Fernandez*, Nos. 14-1089, 14-1091, 2015 WL 3652599, at *11 (1st Cir. June 15, 2015).[9]

If this were a direct appeal, Owens's argument could prove persuasive to this court or the Supreme Court. But that is not where we are, and AEDPA's generous rules of deference apply.

---

[9] The First Circuit was recently faced with an almost identical consistency argument. After recognizing that there is no Supreme Court guidance on how to resolve the question, the court determined that "*Ashe*'s instruction to consider the record in the prior proceeding in determining what the jury necessarily decided is fully applicable to this aspect of the collateral estoppel inquiry." *United States v. Bravo-Fernandez*, 2015 WL 3652599, at *11–12. The court proceeded to review the trial record and ask whether a consistent reading of the verdicts was possible. *Id.*; *see also People v. Wilson*, 852 N.W.2d 134, 151 n.12 (Mich. 2014) (Markman, J., dissenting) ("Defendant does not argue, and no reasonable argument could be made, that this is a case in which the error resulting in the reversal . . . somehow explains the jury's irrational verdict as might be the case when, for example, there was some instructional error affecting only the charge on which defendant was convicted by the jury.").

Relatedly, some states have declined to apply the *Dunn/Powell* rule that inconsistency is not a ground for reversal if it is clear from the record why the jury reached inconsistent results. *See Turner v. State*, 655 S.E.2d 589, 592 (Ga. 2008) (explaining that the exception applies "when instead of being left to speculate about the unknown motivations of the jury the appellate record makes transparent the jury's reasoning"). *Compare State v. Grey*, 685 A.2d 923 (N.J. 1996) (holding that "the *Dunn/Powell* rule should apply when the reason for the inconsistent verdicts cannot be determined" and looking to jury instructions and a jury note in finding the verdicts did not fall within the *Dunn/Powell* rule), *with id.* at 941–42 (Coleman, J., dissenting in part and concurring in part) (arguing that the majority's rationale ignores the *Powell* Court's language "reject[ing], as imprudent and unworkable, a rule that would allow criminal defendants to challenge inconsistent verdicts on the ground that in their case the verdict was not the product of lenity, but of some error that worked against them" (quoting *Powell*, 469 U.S. at 66–67)).

-28-

In sum, we find Owens failed to preserve his challenge to the OCCA's finding that the verdicts in the first trial were inconsistent and that a lack of clearly established Supreme Court law on how to resolve the unusual circumstances presented here would nonetheless make habeas relief inappropriate.

### C.    *Collateral Estoppel*

Owens's next argument challenges the OCCA's reliance on, and application of, the Supreme Court's collateral estoppel decision in *Ashe v. Swenson*, 397 U.S. 436 (1970).  His argument proceeds in two parts.  First, he argues the OCCA unreasonably extended the legal principles from *Ashe* to a new context.[10]  In his view, the *Ashe* analysis of asking what a jury necessarily decided is relevant only where there is a general verdict and the question is whether the jury based its acquittal on some discrete fact or element of the offense.  He contends that particularized inquiry simply does not apply in a case like his where the ultimate issue of fact relevant in the subsequent proceeding (the felony murder predicate) is the entire offense on which the jury acquitted.  Second, he argues even if *Ashe* does apply, the OCCA applied it unreasonably because *Ashe* assumes jury

---

[10]  Despite Owens's use of both "contrary to" and "unreasonable extension" language in the first part of his argument, the core of his argument is that the OCCA unreasonably extended principles from *Ashe* to a new context where they should not apply.  Aplt. Br. at 38 (citing *Parker v. Scott*, 394 F.3d 1302, 1308 (10th Cir. 2005), which recognized the unreasonable-extension argument); *see also id.* at 20 (characterizing the argument as an unreasonable extension argument).  In any event, it is clear the OCCA's rejection of the collateral estoppel claim is not "contrary to" a holding in *Ashe*.

rationality and a rational jury could not have grounded the acquittal on anything other than a decision that Owens did not rob Javier.

The State argues in response that both arguments reflect a misapprehension of the OCCA's reliance on *Ashe*. We agree. The OCCA's opinion can only be characterized as a straightforward application of *Powell*. The OCCA did begin its analysis of the collateral estoppel claim by noting that Owens was relying on Supreme Court cases, including *Ashe*, "which hold that double jeopardy or collateral estoppel bars retrial where a jury has necessarily, by acquittal, determined an issue of ultimate fact which would have to be proved in any subsequent trial." R., Vol. I at 209–10. The OCCA also correctly stated that it was Owens's "burden to show that the ultimate issue the State seeks to relitigate was decided in the first proceeding." *Id.* at 210 (citing *Dowling*, 493 U.S. at 350).

But the OCCA's ultimate conclusion on the collateral estoppel claim was not that the jury failed to decide an ultimate issue of fact in Owens's favor, as required by *Ashe*. Rather, the OCCA stated that the "inconsistent verdicts in Owens's first trial bears on [his] argument that collateral estoppel prevents retrial." *Id.* at 211. The holding was that Owens could not meet his burden to "show that jurors actually determined he did not participate in the robbery" *since* "[w]here jurors have returned inconsistent verdicts, collateral estoppel cannot apply, because a reviewing or subsequent court cannot determine why jurors acquitted a defendant of one or more charges." *Id.*; *see also id.* ("Because the

-30-

jury's verdicts were inconsistent, the record does not show jurors necessarily decided any issue in Owens's previous trial which would preclude a conviction for felony murder on retrial.").  In support, the OCCA cited *Powell*, not *Ashe*.

Owens's unreasonable extension argument fails, at a minimum, because he concedes in his reply brief that even under his theory of collateral estoppel "the *Powell* truly inconsistent test" could nonetheless "defeat" the preclusive effect of the acquittal.[11]  Reply Br. at 30.  Accordingly, we need not reach Owens's argument that the collateral estoppel analysis is altered where the ultimate issue of fact relevant in the second proceeding is the entire offense underlying the acquittal in the first proceeding, a proposition we find doubtful.  We therefore turn to his second argument that the OCCA unreasonably applied *Ashe* to the facts of his case.

Owens contends *Ashe* presumes jury rationality since it asks "whether a rational jury could have grounded its verdict upon an issue other than that which

---

[11]  We have previously held that an argument under § 2254(d)'s unreasonable-application prong may take the form of an argument that a state court "either unreasonably extend[ed] a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuse[d] to extend that principle to a new context where it should apply." *Parker v. Scott*, 394 F.3d 1302, 1308 (10th Cir. 2005) (quoting *Carter v. Ward*, 347 F.3d 860, 864 (10th Cir. 2003)).  We note, however, that we have not yet had the occasion to consider an unreasonable-extension argument in the wake of the Supreme Court's recent decision in *White v. Woodall*, 134 S. Ct. 1697, 1703 (2014), rejecting its counterpart, the unreasonable-refusal-to-extend argument.  In *White*, the Court reasoned that "if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision." *Id.* at 1706 (internal quotation marks omitted).

the defendant seeks to foreclose from consideration." 397 U.S. at 444. Because he says the only path to rationality in this case is that the jury read the felony murder instruction not to require a finding that Owens robbed Javier, the jury, by its acquittal, necessarily decided he did not rob Javier.

This argument misunderstands the interplay between *Powell* and *Ashe*. A determination that *Powell* applies precedes any application of the *Ashe* analysis because once *Powell* applies, the presumption that we can determine what the jury necessarily determined by its acquittal is no longer available. Said another way, it is of no consequence whether, absent the presence of inconsistent verdicts, the acquittal would be entitled to preclusive effect. In *Powell*, the Court recognized that collateral estoppel is premised on the assumption that the jury acted rationally. Because inconsistency in verdicts means that the jury may have acted irrationally, an exercise predicated on jury rationality and the assumption that the jury found certain facts in reaching its verdict is "no longer useful." 469 U.S. at 68.

Given the OCCA's finding that the verdicts in Owens's first trial were inconsistent, it was not objectively unreasonable for the court to find the inconsistency precluded Owens from establishing the preclusive effect of the acquittal.[12]

---

[12] Although we may look only to Supreme Court holdings in assessing a habeas petition under § 2254(d), we note that most courts have reached the same result in

(continued...)

### D.    *Continuing Jeopardy*

Owens's final argument is that the OCCA's holding that Owens was subject to continuing jeopardy on the felony murder charge was contrary to clearly established law.  Specifically, he contends that even where continuing jeopardy would otherwise allow for retrial on a charge, *Yeager* establishes that collateral estoppel may nonetheless act as a bar to the second trial.

The Double Jeopardy Clause is not "an absolute bar to successive trials." *Justices of Bos. Mun. Court v. Lydon*, 466 U.S. 294, 308 (1984); *see also Oregon v. Kennedy*, 456 U.S. 667, 672 (1982) ("The Double Jeopardy Clause . . . does not offer a guarantee to the defendant that the State will vindicate its societal interest

---

[12](...continued)
considering the application of collateral estoppel to a case of inconsistent verdicts.  *See Bravo-Fernandez*, 2015 WL 3652599, at *5, *12; *Simpson v. Lockhart*, 942 F.2d 493, 496 (8th Cir. 1991); *United States v. Citron*, 853 F.2d 1055, 1058 (2d Cir. 1988) ("The defendant's burden is particularly difficult to satisfy when the jury has reached inconsistent verdicts.  Such verdicts, whether based on error, confusion, or a desire to compromise, give little guidance as to the jury's factual findings."); *Hoffer v. Morrow*, 797 F.2d 348, 352 (7th Cir. 1986) ("[A]n inconsistent verdict cannot be used to establish collateral estoppel and thereby bar retrial under the double jeopardy clause . . . ."); *United States v. Price*, 750 F.2d 363, 266 (5th Cir. 1985); *United States v. Bruno*, 531 F. App'x 47, 49 (2d Cir. 2013); *Evans v. United States*, 987 A.2d 1138, 1142–43 (D.C. 2010); *State v. Kelly*, 992 A.2d 776, 786 (N.J. 2010) ("Thus, in cases of inconsistent verdicts returned by the same jury at the same trial, the doctrine of collateral estoppel or issue preclusion has no meaning, because it cannot be determined why a jury returned an acquittal."); *see also* 2A Charles Alan Wright et al., Federal Practice & Procedure § 468 (4th ed. 2015) ("Res judicata concepts are not applicable to inconsistent verdicts.").  *But see People v. Michigan*, 852 N.W.2d 134 (Mich. 2014) (holding that inconsistent vacated convictions have no place in the collateral estoppel analysis of an acquittal).

-33-

in the enforcement of the criminal laws in one proceeding."). As a general matter, the Clause does not bar reprosecution if a jury fails to reach a verdict or if a defendant successfully appeals a conviction on a ground other than sufficiency of the evidence. *Justices of Bos.*, 466 U.S. at 308; *see also United States v. Ball*, 163 U.S. 662, 672 (1896). The reprosecution is considered a continuation of the original jeopardy. *Yeager*, 557 U.S. at 118.

In *Yeager*, the defendant achieved a hung verdict on several insider trading counts and the government sought to retry him. The Supreme Court recognized that the government would ordinarily be free to reprosecute Yeager on the insider trading counts because the jury's failure to reach a verdict meant jeopardy on those charges had not terminated. The Court found, however, that "the question presented [could not] be resolved by asking [only] whether the Government should be given one complete opportunity to convict" Yeager because the Double Jeopardy Clause also embodies a second, dueling interest "in the preservation of the finality of judgments." *Id.* (internal quotation marks omitted). The interest in "preserving the finality of the jury's judgment on the fraud counts" meant that collateral estoppel may nonetheless apply to bar the reprosecution on the insider trading counts despite the continuing jeopardy.

After reciting the uncontroversial proposition after *Yeager* that continuing jeopardy does not end the inquiry where a defendant also argues collateral estoppel applies, Owens succinctly concludes "[t]he OCCA's reliance on

-34-

continuing jeopardy contradicts the governing law." Aplt. Br. at 36 (internal quotation marks omitted). We cannot agree. The OCCA stated that continuing jeopardy applies to the felony murder charge and then went on to consider whether collateral estoppel nonetheless precluded the retrial. The OCCA concluded that collateral estoppel did not apply given the inconsistency of the verdicts in the first trial, and thus, continuing jeopardy permitted Owens to be retried on the felony murder charge. The OCCA never said that because Owens was subject to continuing jeopardy, collateral estoppel could not be a bar to his retrial.

Thus, we find no basis for finding the OCCA's decision was contrary to clearly established law.

## III. Conclusion

Owens has not met his burden of showing that one of § 2254(d)'s exceptions applies. Applying AEDPA deference, we cannot grant relief. AFFIRMED.