FILED
United States Court of Appeals
Tenth Circuit

December 18, 2024

Christopher M. Wolpert
Clerk of Court

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

SALVADOR BRAVO,

    Petitioner - Appellant,

v.

ATTORNEY GENERAL OF THE
STATE OF NEW MEXICO; OTERO
COUNTY PRISON FACILITY,

    Respondents - Appellees.

No. 24-2034
(D.C. No. 2:22-CV-00193-DHU-JFR)
(D. N.M.)

_____

## ORDER DENYING CERTIFICATE OF APPEALABILITY*
_____

Before **PHILLIPS**, **CARSON**, and **FEDERICO**, Circuit Judges.
_____

Salvador Bravo filed a pro se application for relief under 28 U.S.C.
§ 2254, challenging his 2016 conviction in New Mexico state court of one count
of second degree criminal sexual penetration of a minor. He also sought an
evidentiary hearing. A magistrate judge issued a recommendation to deny an
evidentiary hearing, dismiss the application as untimely, and deny a certificate
of appealability (COA). Over Bravo's objections, the district court adopted the

---

    * This order is not binding precedent except under the doctrines of law of
the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

recommendation, dismissed the application as untimely without holding an evidentiary hearing, and denied a COA. Bravo now seeks a COA from this court so he can appeal the dismissal. *See* 28 U.S.C. § 2253(c)(1)(A) (requiring a COA to appeal the denial of a § 2254 application). We deny a COA and dismiss this matter.

## I

A COA will issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires "showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks omitted). In other words, the applicant must show the district court's resolution of the constitutional claim was either "debatable or wrong." *Id.*

If, as in this case, the habeas application was denied on procedural grounds, the applicant faces a double hurdle. Not only must the applicant make a substantial showing of the denial of a constitutional right, but he must also show "that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* "Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a

2

reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further." *Id.*[1]

## II

The district court concluded that Bravo did not timely file his § 2254 application within the one-year statute of limitations set out in 28 U.S.C. § 2244(d). As in the district court, Bravo does not argue here that he filed his application within the limitations period. Instead, he argues his untimeliness should be excused because (1) new evidence demonstrates his actual innocence and (2) equitable and statutory tolling apply. We address each argument in turn, affording his pro se filings a liberal construction, but without acting as his advocate. *Yang v. Archuleta*, 525 F.3d 925, 927 n.1 (10th Cir. 2008).

## III

"[A] credible showing of actual innocence may allow a prisoner to pursue his constitutional claims . . . on the merits notwithstanding the existence of a procedural bar to relief." *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013). "[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass" despite the "expiration of the statute of limitations." *Id.* at 386. To

---

[1] Although § 2254 uses the terms "applicant" and "application" instead of "petitioner" and "petition," the terms are synonymous and used interchangeably.

show actual innocence, an applicant must present "new reliable evidence . . . that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). "To be 'new,' the evidence need only be evidence that was not considered by the fact-finder in the original proceedings." *Taylor v. Powell*, 7 F.4th 920, 927 (10th Cir. 2021); *see also Fontenot v. Crow*, 4 F.4th 982, 1032 (10th Cir. 2021) (explaining that, under *Schlup*, "new evidence" means evidence "newly presented" rather than evidence "newly discovered through diligence").

An applicant's "burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt – or , to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." *House v. Bell*, 547 U.S. 518, 538 (2006). The habeas court must evaluate the new evidence "in light of all the evidence," *Schlup*, 513 U.S. at 328 (internal quotation marks omitted), and then "make a probabilistic determination about what reasonable, properly instructed jurors would do," *id.* at 329. To meet this threshold, the applicant's case must be "truly extraordinary." *Id.* at 327 (internal quotation marks omitted).

## IV

Bravo first argues that four evidentiary items, that he claims he did not receive until three years after his trial, allow him to pass through the actual-innocence gateway: (1) a Sexual Assault Nurse Examiner report (SANE

4

report), (2) a transcript of the victim's safehouse interview, (3) case materials from a separate state district court matter purportedly bearing on the victim's credibility, and (4) a DNA laboratory report.[2] We address each in turn.

## A

The SANE report is a 17-page document a nurse completed the same day the victim reported the sexual assault. *See* R. II at 1095–1110. It documents the victim's narrative of the events as follows: the victim, then 15 years old, was babysitting for Bravo and his girlfriend, S.T., who had gone out to a bar and then returned to host an after party. The victim spent the night, first sleeping in a bedroom with the children and then moving to a couch in the living room. In the morning, Bravo approached, took the victim's covers, laid them on the floor, and asked the victim to come down to the floor. When the victim resisted, Bravo grabbed her hand, pulled her to the floor, and kissed her on the neck. The victim again resisted. Bravo then removed his pants and her clothes and, despite her continued protests, penetrated her digitally and with his penis. The victim could not free herself until S.T. entered the room. Upon returning home, the victim took a shower and told her father what had happened.

---

[2] Bravo alleged he received these items on November 19, 2019, several years after his trial. The district court accepted that allegation as true because the State did not contest it. We also accept it as true for purposes of this appeal. *But see infra*, footnotes 3 and 5.

In addition to documenting the victim's narrative, the nurse checked boxes on the SANE report indicating Bravo kissed, licked, and bit the victim. The nurse also noted bruises on the victim's arms and legs but not injuries to the victim's vagina, although the victim reported sharp vaginal pain.

At trial, the State introduced only a single-page diagram from the SANE report. In his § 2254 application, Bravo argued that without the complete report, the jury was unable to compare statements the victim made in the report with those she made at trial and therefore could not properly evaluate her credibility, which was critical because the evidence of guilt was allegedly not overwhelming and there was a lack of inculpatory forensic evidence. The district court concluded the failure to disclose the SANE report was not prejudicial because, despite not having the report, defense counsel cross-examined the nurse regarding its salient aspects. During that cross-examination, the nurse admitted she did not see any injuries in or near the victim's vagina; she had no idea how, when, or where the bruising on the victim's arms or legs occurred; and there were no signs of bite marks.

Having reviewed the SANE report considering all the trial testimony, we cannot say that if defense counsel had the SANE report and used it to cast doubt on the credibility of the victim and the nurse, it is more likely than not that any reasonable juror would have reasonable doubt of Bravo's guilt. *See Schlup*, 513 U.S. at 330 (noting that "under the gateway standard[,] . . . newly

presented evidence may indeed call into question the credibility of the witnesses presented at trial" and require a "habeas court . . . to make some credibility assessments"). On direct examination, the SANE nurse testified about the details of the report Bravo now highlights, and defense counsel cross-examined the nurse regarding those details. Moreover, defense counsel elicited testimony from the victim that, contrary to what was recorded in the SANE report,[3] she did not tell the SANE nurse Bravo had kissed, licked, or bitten her. Thus, the inconsistencies between the victim's testimony and the SANE report's documentation of her statements allegedly made to the nurse were adequately presented for the jury's consideration of the effect, if any, those inconsistencies had on her credibility.

**B**

Bravo next points to an excerpt of a transcribed interview of the victim performed at a safehouse. *See* R. II at 739–44. He contends that contrary to the SANE report, "not once" in the interview "did [the victim] ever claim Bravo had kissed her, licked her, or bit her." COA Appl. at 47. From this premise he reasons that because the safehouse interview "differed significantly from [the victim's] testimonial statements in the SANE report, the value of [the victim's

---

[3] Again, we accept as true Bravo's contention that his defense did not have the SANE report at the time of trial. However, the cross-examination of the victim and the nurse belies otherwise, as defense counsel asked questions that appear to have been sourced from the report.

trial] testimony would have been substantially reduced or destroyed." *Id.* at 48 (internal quotation marks omitted).[4]

Bravo's premise, however, overlooks that in the Safehouse interview, the victim stated that Bravo "started sucking and biting [her] neck." R. II at 741. Although that statement is, as Bravo notes, inconsistent with her trial testimony that she did not tell the SANE nurse that Bravo kissed, licked, or bit her, it is generally *consistent* with the SANE report, where she told the nurse Bravo had kissed, licked, and bitten her. And as noted, the inconsistency between the SANE report and the victim's trial testimony, the implication of which was that Bravo did not bite, lick, or kiss her, were adequately presented for the jury's consideration. Thus, reasonable jurists would not debate that if the safehouse interview had been used at trial to challenge the victim's credibility, it is more likely than not that any reasonable juror would have reasonable doubt of Bravo's guilt.

## C

In another attempt to attack the victim's credibility, Bravo relies on evidence from a restraining-order proceeding the victim brought against him several months before his criminal trial in July 2016. As a condition of Bravo's

---

[4] In his § 2254 filings, Bravo emphasized other aspects of the safehouse interview, which the district court rejected in its actual-innocence analysis. He does not rely on any of those other aspects in this COA application.

release pending trial, he was prohibited from having contact with the victim. In February 2016, the victim petitioned for a protective order based on allegations that Bravo had stalked her on two occasions. After a hearing, a state Special Master found there was "insufficient evidence . . . to prove that an incident of stalking occurred" and denied relief. *Id.* at 618. Bravo argues that this evidence is additional proof of the victim's propensity to lie.

The district court concluded this evidence did not suggest it was less likely Bravo committed the charged offense and that the evidence's impeachment value was at best minimal. Reasonable jurists would not debate these conclusions. The dismissal of the petition for a protective order based on insufficient evidence casts only some doubt, if any, on the victim's general credibility but not enough to make it more likely than not that any reasonable juror would entertain reasonable doubt whether Bravo was guilty. *See Frost v. Pryor*, 749 F.3d 1212, 1232 (10th Cir. 2014) ("Simply . . . casting *some doubt* on witness credibility[] does not necessarily satisfy [*Schlup*'s actual innocence] standard." (emphasis added)).

## D

At trial, the State presented an expert witness in DNA serology to testify about the results of her DNA analysis, which detected male DNA from swabs

9

taken from the victim but were inconclusive whether it matched Bravo's DNA.[5]

In his § 2254 application, Bravo contended that the DNA report casts doubt on

the expert's testimony and defense counsel's use of it would have led to

acquittal. The district court rejected his argument.

In his COA application, Bravo observes that the report appears to have

conflicting results – human male DNA was identified on "item 3B" but "no male

Y-STR DNA profile [was] obtained from item 3B," R. II at 571–72. The expert,

however, addressed this aspect of the report. She testified that the victim had

used a genital wipe and showered prior to collection of the samples, and that

affected the quantity of foreign DNA present. She then explained that item 3B

had human male DNA, but because the sample contained an overwhelming

amount of female DNA, she could not perform conventional DNA testing. She

therefore reverted to what she called male Y-STR testing, which detects and

tests only for the presence of male DNA. That test, however, did not uncover

enough male DNA to a make a male Y-STR DNA profile, so she was unable to

---

[5] Although the expert used her written report to refresh her recollection of the results, Bravo contends the report was not provided to him until more than three years after his trial. Again, for purposes of argument, we accept that contention. However, we note the district court's observation that it appeared a defense investigator had received a copy of the report and communicated its contents to defense counsel about a month prior to trial. *See* R. III at 83 n.8. But because the State did not dispute Bravo's contention that the report had not been disclosed to him until November 2019, the district court treated it as new evidence for purposes of its actual-innocence analysis. *See id.*

determine whether it matched Bravo's DNA sample. Thus, the purportedly conflicting results do not advance Bravo's claim of actual innocence because the jury heard the nurse's explanation and was able to credit her testimony, or not, as it saw fit.

Second, Bravo argues that the method the expert used to analyze the DNA, known as polymerase chain reaction amplification, requires only a very small quantity of DNA to make a definitive match with a known sample. He claims that if his counsel had a copy of the report in advance, he could have sought out his own expert to contest the State-expert's testimony, either through more-effective cross-examination as to why the State's expert could not identify or exclude Bravo as the DNA match, or through direct evidence based on testing the defense expert could have performed. This argument, however, does not transform the DNA report into new evidence of Bravo's actual innocence. Instead, it presents only a speculative exculpatory theory based on what might have happened if defense counsel had the report in advance of trial. As such, it is insufficient to meet Bravo's heavy burden to demonstrate actual innocence through new evidence. *See Taylor*, 7 F.4th at 927 ("An actual innocence claim must be based on more than the petitioner's speculations and conjectures.").

In sum, reasonable jurists would not debate the correctness of the district court's conclusion that the DNA report does not open the actual innocence gateway for Bravo.

## V

In his COA application, Bravo also attempts to pass through the actual-innocence gateway by relying on two other evidentiary items he claims to have received in 2021: (1) a report from a hospital exam in which the victim stated she was "only sore in the vagina," Suppl. R. I at 317 (capitalization omitted); and (2) a video interview with S.T. conducted by police on the day of the offense. Although the district court did not address these items, we conclude that reasonable jurists would not debate whether either of them allows Bravo to show actual innocence.

## A

Bravo argues the victim's statement recorded in the hospital report that she was "only sore in the vagina," *id.* (capitalization omitted), conflicts with her complaints to the SANE nurse later the same day that she had "sharp pain" in her vagina, R. II at 1102, pain from bruises to her arms and legs, and been bitten on the back. Based on these purportedly conflicting complaints, Bravo advances two arguments. He first contends defense counsel could have used the hospital report to impeach the victim. But as discussed above in connection with the SANE report and the safehouse interview, the victim's credibility

regarding her differing accounts of her injuries was adequately presented for the jury's consideration. The hospital report adds very little, if anything, to help Bravo meet the rigorous actual innocence standard.

Second, Bravo argues that because the victim complained of vaginal pain, there should have been some physical sign of a sexual assault, but the vaginal-exam findings were normal, and the victim's hymen was intact. The SANE nurse, however, explained at trial the reasons that not all vaginal penetrations cause physical injuries. In light of that testimony, we conclude that even if the hospital report was presented at trial, no reasonable juror would have had reasonable doubt as to Bravo's guilt.

## B

On the day of the offense, a detective conducted a video interview with S.T. in which S.T. gave statements incriminating Bravo. At trial, however, S.T.'s story differed from what she told the detective. Testifying for the State, she admitted she told the detective that when she walked into the living room, she saw Bravo and the victim on the floor with blankets and pillows. When pressed to admit she told the detective Bravo jumped up wearing only a jersey, S.T. equivocated, claiming she was still inebriated when she was interviewed and also mad at Bravo, so she may have said some things just to get Bravo in trouble. She also equivocated when asked if she told the detective that Bravo said "no, no, no, this isn't what it looks like, I screwed up, I'm going to prison,"

Trial Recording -1329 at 1:21:30–39,[6] stating only that he said "it's not what you think" and "let me explain," *id.* at 1:21:57 to 1:22:02.

The video of her police interview was then played for almost 13 minutes. *See* Trial Recording -1521 at 4:08 to 16:55. At one point, S.T. told the detective that when she walked into the living room, Bravo cursed and got up, wearing just his jersey, and began saying things like "this is where it ends," "this is where my life ends," "this is it," "I'm done," "I'm cooked," "I screwed up," and "I'm going to prison." *Id.* at 15:53 to 16:21. S.T. further told the detective that Bravo then said he had not done anything with the victim. Finally, she reported that Bravo added, "you know why I did this? . . . Because we have a bad relationship and this was my only way out." *Id.* at 16:47–52.

Bravo contends the prosecution intentionally stopped the recording before S.T.'s statement that when she confronted the victim, the victim claimed Bravo had only rubbed her stomach. Bravo also contends that if he had a copy of the video interview in advance of trial, he could have used it to counter the

---

[6] The audio recording of the trial (there is no written transcript in the record) was lodged in the district court, *see* Suppl. R. II at 67, and transmitted to this court in a series of digital audio files. We identify the audio files from which we quote by referring to the four digits after the hyphen in the file names.

prosecution's statements to the jury that S.T. was a witness to the crime and had seen Bravo lying on top of the victim.

We are not persuaded that a COA is warranted with respect to the video interview. First, Bravo admits the jury was allowed to view the entire video interview during deliberations, so arguably the interview is not new evidence, and the jury would have heard S.T. tell the detective that the victim said Bravo had only rubbed her stomach. Second, the record contains the detective's written report discussing the interview. The detective expressly noted S.T. said the victim told her all Bravo had done was "rub her stomach." R. II at 1079. Bravo has not claimed he learned of the detective's report after the trial, so plainly he knew of the victim's statement at the time of trial. And third, on cross-examination, S.T. admitted her trial testimony was different than what she told the detective. She testified she could not remember if Bravo was wearing pants when he got up but then reasoned he must have been because he was standing in the hallway fighting with her. She claimed she did not remember if Bravo said he was going to go to prison and that she was mad at him when she told the detective he had said that. Thus, the jury had adequate details of what S.T. said she observed to evaluate whether the evidence

supported the prosecution's argument that S.T. had seen Bravo lying on top of the victim.

## VI

We now turn to Bravo's tolling theory. Under 28 U.S.C. § 2244(d)(1), there is a one-year limitations period for a state prisoner to file an application for a writ of habeas corpus. As relevant here, the one-year period begins to run from the later of either "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review," § 2244(d)(1)(A), or "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence," § 2244(d)(1)(D). The statute also contains a tolling provision: "The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." § 2244(d)(2). In addition to statutory tolling, the one-year period "is subject to equitable tolling." *Holland v. Florida*, 560 U.S. 631, 645 (2010). To benefit from equitable tolling, a § 2254 applicant must show "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Id.* at 649 (internal quotation marks omitted).

16

The district court calculated that 322 days of the one-year period ran from March 7, 2020, when Bravo's state conviction became final, to January 25, 2021, when he filed a habeas petition in state court. The court found that the period was then tolled pursuant to § 2244(d)(2) through October 20, 2021, when the New Mexico Supreme Court denied review of the state district court's denial of that habeas petition. The district court further found that the remaining 41 days of the limitations period ran out on December 2, 2021, so Bravo's § 2254 application, filed on March 16, 2022, was 105 days late. In reaching that conclusion, the court rejected Bravo's arguments that equitable tolling and additional statutory tolling rendered his application timely.

In his COA application, Bravo's chief argument is that equitable tolling renders his § 2254 application timely under § 2244(d). He concedes that his conviction became final on March 7, 2020, but contends the one-year period ran only until May 7, 2020, a 60-day period,[7] when the prison where he was incarcerated was placed on a COVID-19 lockdown that impeded his ability to access legal research and to review his legal files.[8] He argues that equitable

---

[7] Bravo miscounts the number of days the period ran between March 7, 2020, and May 7, 2020; he says it was 30 days, *see* COA Appl. at 82, but it was 60. Our ensuing recitation of his argument accounts for this error.

[8] Bravo also appears to argue that the lockdown amounts to a state-created impediment to filing his § 2254 application and thus delayed the

tolling ended on December 20, 2020, when the lockdown ended, at which point the limitations period ran for another 34 days until statutory tolling kicked in under § 2244(d)(2). He concludes that when the statutory tolling period ended on October 20, 2021, he still had 271 days remaining in which to file his § 2254 application, or until July 19, 2022, and he filed well before that deadline.

Reasonable jurists would not debate the district court's conclusion that Bravo is not entitled to equitable tolling because he failed to explain how the prison lockdown prevented him from timely filing his § 2254 application. When the lockdown ended on December 20, 2020, Bravo was able to file his state habeas petition on January 25, 2021, only thirty-six days later. Just over ten months then passed until § 2244(d)(1)'s one-year period ended on December 2, 2021, yet he has not explained why he was unable to research and prepare his § 2254 application during that time, in the event the state courts denied habeas relief. Also, to the extent Bravo suggests he first needed to exhaust state remedies before filing his § 2254 application, he could have filed a protective federal habeas petition. *See Pace v. DiGuglielmo*, 544 U.S. 408, 416 (2005) ("A

---

onset of the limitations period to "the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action," § 2244(d)(1)(B). But he fails to explain the details and limitation of the lockdown, or how the lockdown amounts to a constitutional violation or a violation of federal law. We therefore examine his argument only as a matter of equitable tolling.

18

prisoner seeking state postconviction relief might avoid [an exhaustion versus § 2244(d) limitations] predicament . . . by filing a 'protective' petition in federal court and asking the federal court to stay and abey the federal habeas proceedings until state remedies are exhausted."). Further still, Bravo did not file his § 2254 application for almost five months after his state proceedings ended on October 20, 2021, even though the claims in the two proceedings are similar. Thus, given this record, reasonable jurists would not debate that the lockdown did not prevent him from timely filing his § 2254 application such that the one-year limitations period should be equitably tolled.

In the alternative, Bravo claims that under § 2244(d)(1)(D), the limitations period did not begin to run until December 13, 2021, which is when he received the detective's video-interview with S.T. *See* COA Appl. at 80.[9] To reiterate, under § 2244(d)(1)(D), the limitations period begins to run on "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." We have acknowledged that in some circumstances, the limitations period begins to run pursuant to § 2244(d)(1)(D) when an applicant receives evidence withheld in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). *See, e.g.*, *Carter v. Bigelow*, 787 F.3d

---

[9] The district court did not address this theory even though Bravo raised it in his response to the court's order to show cause why his application should not be dismissed as untimely. *See* Suppl. R. II at 42–44.

1269, 1282 (10th Cir. 2015) (collecting cases). As we explain, however, the circumstances of this case do not fall within the ambit of § 2244(d)(1)(D).

The nondisclosure of the video interview forms the factual predicate of Bravo's *Brady* claim. But Bravo knew of this factual predicate at the time of trial, not when he received a copy of the interview on December 13, 2021. And it is the substance of S.T.'s statements to the detective, not the video recording of the interview itself, that forms the factual predicate of Bravo's claim that the prosecutor committed misconduct by (1) stating to the jury that S.T. saw Bravo on top of the victim and (2) intentionally stopping the tape before the jury could hear S.T. tell the detective that the victim told her Bravo had only rubbed her stomach. Bravo knew of these factual predicates before receiving a copy of the interview because he made the same arguments in his state habeas petition filed on January 25, 2021. *See* R. II at 458 (arguing prosecutorial misconduct based on comment that S.T. saw Bravo lying on top of the victim); *id.* at 452 (arguing prosecutor committed misconduct by stopping the recording before S.T. related the victim's alleged rubbed-her-stomach comment and citing the detective's written account of the interview in support). Although the copy of the video interview itself may have bolstered the prosecutorial misconduct claims, it was unnecessary to Bravo's discovery of their factual predicates. *See Earl v. Fabian*, 556 F.3d 717, 725 (8th Cir. 2009) (rejecting § 2244(d)(1)(D) argument because applicant had "made the very same [merits]

20

argument before the state courts" and thus "knew the factual predicate of his claim even before the date on which he could file for habeas relief"); *Rivas v. Fischer*, 687 F.3d 514, 535 (2d Cir. 2012) ("[I]f new information is discovered that merely supports or strengthens a claim that could have been properly stated without the discovery, that information is not a 'factual predicate' for purposes of triggering the statute of limitations under § 2244(d)(1)(D)").

## VII

The district court also denied Bravo's request for an evidentiary hearing. Bravo has not demonstrated that the district court could not resolve the untimeliness of his § 2254 application on the existing record. Therefore, reasonable jurists would not debate whether the district court abused its discretion in denying an evidentiary hearing. *See Fisher v. Gibson*, 262 F.3d 1135, 1145 (10th Cir. 2001) (stating that an evidentiary hearing is a "matter of discretion" in the § 2244 context); *Torres v. Mullin*, 317 F.3d 1145, 1161 (10th Cir. 2003) (district court does not abuse its discretion in denying evidentiary hearing when it can dispose of § 2254 application on the record).

The application for COA is DENIED.

Entered for the Court


Richard E.N. Federico
Circuit Judge

21